**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HITCHINER MANUFACTURING COMPANY, Respondent.**

No. 80–1109.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1980.

Decided Nov. 19, 1980.

Susan Tepper Papadopoulos, Atty., N. L. R. B., Washington, D. C., for petitioner.

Thomas M. Hanna, St. Louis, Mo., for respondent.

Before STEPHENSON, HEANEY and ADAMS,* Circuit Judges.

PER CURIAM.

This case is before the Court upon the application of the National Labor Relations Board pursuant to § 10(e) of the National Labor Relations Act for enforcement of its order issued against Hitchiner Manufactur-

---

* The Honorable Arlin M. Adams, United States Court of Appeals for the Third Circuit, sitting by designation.

ing Company (the Company) on August 1, 1979.[1]

*Background*:

The Company is engaged in the manufacture, sale and distribution of castings at its plant in O'Fallon, Missouri. The United Steelworkers of America (the Union) began organizing the Company's production and maintenance employees in February, 1978. By June 1, eighty–eight of the 163 employees in the unit had signed authorization cards designating the Union as their collective bargaining representative. Above the line designated for signature, the authorization cards stated:

> I hereby request and accept membership in the UNITED STEELWORKERS OF AMERICA, and of my own free will hereby authorize the United Steelworkers of America, its agents or representatives, to act for me as collective bargaining agency in all matters pertaining to rates of pay, wages, hours of employment, or other conditions of employment, and to enter into contracts with my employer covering all such matters.

On May 26, the Union petitioned the Board for a representation election. The election was held on July 20, and the Union lost by a vote of 84–52.

The Union then filed charges with the Board claiming that the Company had violated 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by threatening employees with loss of work privileges, by threatening to bargain "from scratch" if the Union came in, by interrogating employees about their union activities, by informing employee Ron Hall and his co–workers that the true reason for Hall's discharge was his union activity, and by telling an employee that the Company would close its plant in the event of unionization. The Union also charged that the Company violated 8(a)(1) and 8(a)(3), 29 U.S.C. § 158(a)(3), by discharging Hall because of his union activities. After an extended hearing the Administrative Law Judge made the following findings:

---

1. The Board's decision and order are reported at 243 NLRB No. 174.

On about April 16, employee Gary Zblewski heard Production Control Manager Felix tell the Personnel Manager, in the presence of Hall, that if the Union got in "we [would] not be able to have our coffee breaks that we have now and [would] not be able to leave our work areas." On May 9, Hall heard Felix make the same statement to two other employees, saying that "if the union got in ... they couldn't just run and get coffee whenever they wanted."

In late April or early May, Hall had a conversation with Foundry Foreman Ferguson during which Hall expressed the opinion that the hourly employees needed a union in order to deal effectively with the Company's central headquarters. Ferguson replied that "a union is not going to do you any good ... if you go union, you're just going to start from scratch. You'll lose what you've got." On May 24, Third Shift Supervisor Kaufman asked employee Timothy Hill if he and his fellow employee Randy Harris were "pushing union cards," Hill denied they were.

The Personnel Manager, on June 21, approached employee Vicky Henningfeld and a companion in a local bar and initiated a conversation. In the course of the discussion, the Personnel Manager told Henningfeld that the Company was planning to move if the union came in, and that "they had already made the arrangements or [were] looking into the arrangements of selling it, the shell of the building, to ITT." The Personnel Manager also said that "Hitchiner never runs with a union shop and it never would."

Hall was hired by the Company as a cutoff operator in 1972. After working on several other jobs, he became a multi-departmental group leader, and in February 1977, was promoted to Foundry Foreman. He relinquished his supervisory position voluntarily in October 1977 for personal reasons, and became a first-shift group leader in the foundry. At the time of his discharge Hall was still the first-shift group leader in the foundry area. He was discharged on June 1, eight days after the Union filed its election petition. During the months prior to discharge, Hall was quite active in union activities. For example, in March, he successfully led the employees' opposition to the Company's intended institution of a rotating swing shift. And later that month he intervened on behalf of a fellow employee who was being transferred from the day shift to the second shift. On April 11, Hall signed a union authorization card and proceeded to solicit numerous employees to join the union. His solicitation of Gary Zblewski on April 12 was witnessed by Foreman Ferguson. From mid-May until his discharge, Hall wore union buttons in his work hat, and was giving union buttons to all employees. In addition, he placed a union bumper sticker on his truck.

The Company discharged Hall allegedly for being grossly inattentive with respect to the operation of a T-4 oven. During the night of May 29, after loading the oven, the operator of the oven, Kirkpatrick, observed that its over-ride mechanism was not registering properly. He reported the problem to the supervisor. It was thereafter agreed that the oven required the attention of the maintenance department. A maintenance work order was filled out and left on the desk of the maintenance manager. Before the shift ended, Hall advised Kirkpatrick that he had been unable to get anything done about the oven because the maintenance department was too busy. At about 4:30 that day, the maintenance man advised that the oven was working again. Yet, when Kirkpatrick appeared on the third-shift and removed the load, he found it had burned up. Hall was called to the Production Manager's office and asked about the burn up. He explained the malfunctioning and the maintenance orders that had been prepared. The next day Hall was summoned to the Company's conference room and "was told he was being terminated for being grossly inattentive about the heat-treat load." When Hall stated that he had not operated the oven and did not know how to do so, there was no reply. Hall then requested a written statement indicating why he was being discharged. One of the supervisors left to obtain such a statement.

While he was gone, Hall was advised by another supervisor, as follows: "If you breath a word about what I am going to tell you I'll deny it, but you are being fired for union activity .... This is something to stop the union drive." The supervisor then indicated that this was "coming from up top." When Hall asked about copies of prior disciplinary actions, it was explained that his file was in the motel room of Vice–President Boorman, who was visiting from the Company headquarters.

About two weeks after Hall's discharge, it was explained to an employee in regard to the heat treatment matter that "we both know why Ron Hall was fired .... Ron Hall was fired because of the Union, it wasn't because of the T–4 load burning up." During a conversation on June 21 with Henningfeld, in which he mentioned the Company's plan to close the plant if the union came in, Simmons spoke of the trumped–up charges against Hall and the fact that he had told this to Hall but if questioned would have to deny it.

In agreement with the Administrative Law Judge, the Board found that the Company had violated § 8(a)(1) of the Act by threatening employees with loss of work privileges if the union came in, by threatening to bargain from scratch, by coercively interrogating employees, by informing Hall and his co–workers that the true reason for Hall's discharge was his union activity, and by engaging in these actions in order to undermine the Union's majority support. The Board also found that the Company violated §§ 8(a)(3) and (1) of the Act by discharging Hall because of his union activity. Finally, the Board disagreed with its Administrative Law Judge and found that the Company violated 8(a)(1) by telling employees that the Company would close the plant in the event of unionization.

The Board directed the Company to cease and desist from the unfair labor practices it had found, and to cease and desist from in any other manner interfering with, restraining or coercing employees in the exercise of their rights under the Act. Further, the Board ordered the Company to recog-

nize and bargain with the Union and to embody any understanding reached in a signed agreement. Finally, the Company was directed to offer Hall immediate reinstatement to his former position and to make him whole for any losses he had suffered as a result of the discharge.

## DISCUSSION

### A. The Unfair Labor Practices

 Section 7 of the National Labor Relations Act guarantees employees "the right to self–organization, to form, or assist labor organizations" and "to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining....." Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of these rights. The test of a violation of § 8(a)(1) is whether the employer's conduct "reasonably tends to interfere" with the employees' exercise of their Section 7 rights. *N.L.R.B. v. Intertherm, Inc.*, 596 F.2d 267, 271 (8th Cir. 1979). Section 8(a)(3) provides that it shall be an unfair labor practice for an employer to discriminate in regard to tenure of employment so as to discourage membership in a labor organization. The circumstances surrounding the discharge of Hall come within this provision. The Board's determination that particular conduct violates § 8(a)(1) or § 8(a)(3) is entitled to affirmance if supported by substantial evidence. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

We conclude. there was sufficient evidence in the record to support the Board's findings that the Company committed unfair labor practices under §§ 8(a)(1) and 8(a)(3).

### B. The Bargaining Order

In *N.L.R.B. v. Gissell Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court sustained the Board's authority to issue a bargaining order in a case in which "serious unfair labor practices" have been committed "that inter-

fere with the election processes and tend to preclude the holding of a fair election." The Court approved the use of a bargaining order, not only "in 'exceptional cases' marked by 'outrageous' and 'pervasive' unfair labor practices," but also in cases where the unfair labor practices are "less pervasive" but the Board nevertheless finds that the possibility of erasing the effects of past practices and of insuring a fair election . . . by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through [authorization] cards would, on balance, be better protected by a bargaining order . . . ." 395 U.S. 594, 613–15, 89 S.Ct. 1929, 1939–40, 395 U.S. 614, 89 S.Ct. 1940.

> Gissell also emphasized that

> It is for the Board and not the courts . . . to make that determination [as to whether a bargaining order is necessary], based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act . . ., the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by the reviewing courts. 395 U.S. at 612 n.32, 89 S.Ct. at 1939 n.32.

Here, the Board found that as of June 1 the Union had obtained valid authorization cards from 88 of the 163 members of the bargaining unit. It also ascertained that a bargaining order would best protect the rights of the employees, emphasizing the Company's serious threats of economic reprisals and the discharge of a key union activist. The Board explained its conclusion in this regard as follows:

> . . . [H]ere, among other violations of Section 8(a)(1) of the Act, [the Company] repeatedly threatened employees with reprisal and loss of benefits if they selected union representation. Such threats, if implemented, would have had an impact on every employee in the unit. Moreover, preeminent among the threats chargeable to [the Company] are Personnel Manager Simmons' comments about plant closing made less than 1 month before the election. The Board has long recognized that the coercive effects of such statements are particularly difficult to eradicate by traditional remedies.

> Nor can we ignore the fact, as found by the Administrative Law Judge, that [the Company] unlawfully terminated a leading union proponent expressly for the purpose of stalling the union drive and, thereafter, used the discharge to chill the enthusiasm of other employees for the Union. We doubt that the lesson driven home by this discharge will be soon forgotten by employees. Given these circumstances, we have decided that it is unlikely that our traditional remedies will successfully dissipate the lingering effect of [the Company's] unlawful conduct.

■ The Company's unfair labor practices thus related to a number of individual employees, and specifically involved union activist Ron Hall. More importantly, they were aimed at the entire production and maintenance unit. The tactics employed, such as the threatened loss of work privileges and the loss of benefits through "bargaining from scratch" were calculated to effect all the employees. And when these did not succeed in suppressing support for the Union, there is evidence that the Company intensified its opposition by discharging Hall. Since there was a basis for the Board's conclusion that the real reason for the discharge of Hall was his union activity, there was also a basis for concluding that such a discharge would also discourage other employees from supporting the Union. The chilling effect of the discharge episode was accentuated by the statement that the Company planned to close the plant. Indeed, in Gissell the Supreme Court made reference to a study which showed that threats to close or transfer plant operations are particularly destructive of a union majority and election conditions. The fact that the Union had cards from a majority of the employees on June 1 but lost the election held on July 20 by 32 votes, after the Company engaged in a series of unfair labor practices, further supports the Board's

inference that the unfair labor practices tended to undermine the majority's strength and to impede the election processes.

 In response to the Board's entry of the bargaining order, the Company argues that 44 of the authorization cards claimed by the Union, and thus a necessary predicate for the bargaining order, were invalid because the employees in question had signed the cards not to indicate support for the Union but only to secure an election. When an employee has signed an unambiguous card, however, stating that he authorizes the Union to represent him in collective bargaining, as was the case here. Such a card presumptively counts as indicating support for the Union. There is an exception when the employer can demonstrate that the clear language on the card was deliberately and clearly cancelled by a union adherent with words calculated to direct the signer to disregard the language above his signature. *Gissell*, 395 U.S. at 606, 89 S.Ct. at 1936.[2]

Although some of the signers testified that they were advised that the cards were needed to secure a vote, none testified to being told by a Union agent or union solicitor that the *only* purpose was to obtain an election. The Supreme Court in *Gissell* rejected a challenge to cards that had been obtained by representations somewhat similar to those allegedly made here. 395 U.S. at 584 n.5, 89 S.Ct. at 1924 n.5.

*CONCLUSION*

Judgment will be entered enforcing the Board's order in full.

---

**2.** *Cf. Fort Smith Outerwear, Inc. v. N.L.R.B.*, 499 F.2d 223 (1974), where the union solicitor himself indicated that the signing of cards was only to have an election.