NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

FIXTURES MANUFACTURING
CORPORATION, Respondent.

No. 81–1398.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 10, 1981.

Decided Jan. 14, 1982.

Richard Michael Fisch (argued), N. L. R. B., Washington, D. C., for petitioner.

James R. Willard (argued), Kansas City, Mo., for respondent Fixtures Mfg. Corp.

Before HENLEY and ARNOLD, Circuit Judges, and NICHOL,* Senior District Judge.

ARNOLD, Circuit Judge.

This case is before the Court upon the application of the National Labor Relations Board for enforcement of its order against Fixtures Manufacturing Corporation.[1] The Board found that Fixtures violated Sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3),[2] when it dismissed employees William Lindsey and Estel J. Halterman. Fixtures also violated Section 8(a)(1), the Board held, by interrogating Lindsey and threatening its employees with layoffs if they chose to unionize. For the reasons stated below we enforce the Board's order except as to the reinstatement of Halterman. On that issue we remand for further proceedings by the Board.

I.

Fixtures, a Missouri corporation employing about 100 people, manufactures and distributes commercial furniture. Norman Polsky is the company President, Bobbie Snyder is the Plant Manager, and Max Pointer is the Comptroller. A series of thefts plagued Fixtures in 1977 and early 1978. The company suspected Lindsey of wrongdoing and subjected him to a polygraph test on February 21, 1978. The test indicated that he was not involved in any

---

* The Hon. Fred J. Nichol, Senior United States District Judge for the District of South Dakota, sitting by designation.

1. The Board ordered Fixtures to cease and desist from: a) discharging employees for engaging in union activities; b) threatening employees with layoff or laying them off if they decide to unionize; c) interrogating employees about union activities; and d) interfering with, restraining, or coercing its employees in the exercise of the rights which Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, guarantees. The Board also directed Fixtures to: a) reinstate William Lindsey and Estel J. Halterman to their former positions and compensate them for lost earnings; b) preserve and make available the record necessary to compute the proper amount of back pay; c) post appropri-

ate notice at its premises; and d) properly notify the Regional Director of what steps have been taken to comply with the order.

2. Sections 8(a)(1) and (3), 29 U.S.C. §§ 158(a)(1) and (3), provide:

It shall be an unfair labor practice for an employer

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 157 of this Title.

&ast; &ast; &ast; &ast; &ast; &ast;

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization

. . . .

significant thefts but that he was withholding information about other employees who had stolen goods. A written report was dispatched to Pointer on February 22 and received sometime between February 24 and February 27. Pointer discussed it with Snyder (Tr. 168–69) and Polsky (Tr. 170) the following day, that is, no later than Tuesday, February 28, 1978.

The thefts had, meanwhile, ended when employee Ralph Branson resigned on February 17 (Resp. Ex. 2).

Beginning on February 27, 1978, company employees, particularly Halterman and Lindsey, began campaigning for unionization. Halterman first became involved when Jesse Vasquez, a former Fixtures employee, suggested that he talk to union staff representative Glenn Obermeier; Obermeier called Halterman on February 25, 1978. Halterman agreed to serve on a union organizing committee and recruit other Fixtures employees. They arranged a committee meeting for March 1 (Tr. 86).

From February 27 to March 1, Halterman approached at least five employees, including Lindsey, and asked them to join the committee and attend the meeting. Mike Ziehmer, the shipping and assembly manager, Gary Pointer, Max Pointer's son, Pat Dixon, Lindsey's supervisor, and other employees were present or nearby during many of these conversations (Tr. 111, 186–90, 229, 290). Lindsey and another employee, Ralph Moulder, discussed the union with other employees on March 1 (Tr. 231–32, 292). Supervisors are under instructions to report to Mr. Polsky about union activity; all employees are encouraged to do so (Tr. 37).

On the night of March 1, Halterman and Lindsey met with Obermeier and signed authorization cards, designating the union as their representative for collective-bargaining purposes. The following day, while in the presence of other employees, and not far from Ziehmer, Halterman reported the results of the meeting to Moulder (Tr. 194–95, 236). Union activities continued that day (Tr. 236). Fixtures' night supervisor, Ken Capehart, learned of the organizing

activity from an unidentified employee on the evening of March 1; he left a report which Polsky read the following morning, March 2 (Tr. 34).

That afternoon Polsky and Snyder confronted Halterman. Polsky asked whether he had spilled ink on Gary Pointer's book on March 1 and whether he had taken five pairs of scissors on January 5, 1978. Halterman said no (Tr. 194). Polsky told Halterman that he would have to resign or take the polygraph exam (Tr. 46–47). Halterman submitted to the test on Friday, March 3. During the pre-test interview he "admitted to taking a returned table top/corner divider and the damaged base that matched, screws, nuts, bolts, pencils, small pieces of upholstery material, [and] scissors which he stated he had signed for" (Gen. Couns. Ex. #5).

On March 3, Polsky interrogated Lindsey about union activity and fired him, allegedly for his failure to cooperate in the company's investigation of the thefts. Polsky fired Halterman on March 6, citing the results of the polygraph test as cause.

On March 10, 1978, Polsky addressed his employees at a special meeting. He adverted to the advantages and disadvantages of unionization. He said that if the company was unionized "he would have to lay off twenty percent of his people" (Tr. 239).

The Administrative Law Judge found that Fixtures violated Sections 8(a)(1) and (3) of the Act by discharging Lindsey, and Section 8(a)(1) by interrogating Lindsey on March 3, and by threatening its employees with layoffs if they chose to unionize. The ALJ held, however, that Fixtures did not violate the Act when it discharged Halterman. The ALJ found that the polygraph tests implicated him in the thefts, and that the company would have discharged him even if he had not engaged in union activity.

The Board affirmed the findings and conclusions of the ALJ, except as to Halterman. It found that Fixtures violated Sections 8(a)(1) and (3) when it fired Halterman, because the dismissal was based on

the results of a test which was administered because he had engaged in union activity. The Board ordered that he be reinstated and compensated for loss of earnings. The Board did not reach the question whether Halterman (as found by the ALJ) had been involved in misconduct so serious that he would have been dismissed even absent his protected activity. It held simply that the test was conducted for an impermissible reason, and that therefore nothing discovered as a result of the test could be a legitimate reason for discharging Halterman.

## II.

■ Initially we note that this Court must enforce the Board's order if the Board correctly applied the law and if, when the record is viewed in its entirety, there is substantial evidence to justify its findings. *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

It is apparent that Polsky could have had both legitimate and illegitimate motives for firing Lindsey and subjecting Halterman to a polygraph test. Thefts and vandalism had plagued Fixtures for several months; both Halterman and Lindsey were arguably implicated in some wrongdoing. It is clear, however, that Polsky opposed unionization, and there is substantial evidence that he fired Lindsey and subjected Halterman to the polygraph test because of anti-union animus.

The Board has recently held that in determining the propriety of an employee's termination, when he is discharged for both legitimate and illegitimate reasons, it "shall require that the general counsel make a *prima facie* showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct." *Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083, 1089, 105 LRRM 1169, 1175 (1980), *enforced*, 662 F.2d 899, 92 CCH Lab. Cas. ¶ 12,987, 108 LRRM 2513 (1st Cir. 1981), *pet'n for cert. filed*, 50 U.S.L. Week. 3467 (U.S. Nov. 25, 1981) (No. 81–897).

■ We hold that there is "a reasonable basis in law" for the Board's use of the *Wright Line* test, and that it may therefore be applied. See *National Labor Relations Board v. Hendricks County Rural Electric Membership Corp.*, —— U.S. ——, ——, 102 S.Ct. 216, 221, 70 L.Ed.2d 323 (1981). It protects the rights of employees while preserving an employer's right to discharge an employee for a valid cause. *National Labor Relations Board v. Nevis Industries, Inc.*, 647 F.2d 905 (9th Cir. 1981). Several courts of appeals have already accepted and applied the *Wright Line* test, and we too find it analytically sound.[3] *National Labor Relations Board v. Robin American Corp.*, 654 F.2d 1022 (5th Cir. 1981); *National Labor Relations Board v. Peavey Co.*, 648 F.2d 460 (7th Cir. 1981); *National Labor Relations Board v. Nevis Industries, Inc., supra*.[4]

---

**3.** The Board did not cite *Wright Line* in its opinion in this case, which was decided on the same day as *Wright Line*, but its analysis is consistent with the *Wright Line* framework.

**4.** The First Circuit, in reviewing *Wright Line* itself, expressed some reservations about the Board's putting a burden on the employer to demonstrate that it would have taken the same action even in the absence of an employee's protected conduct. It enforced the Board's order in the end, however. We have considered the First Circuit's criticisms of the *Wright Line* analytical framework and believe they are not well taken. This kind of burden-shifting, we think, is well within the latitude that the Board

should have in structuring its fact-finding process in difficult cases.

The Fifth Circuit, as noted in text, has applied *Wright Line*. *National Labor Relations Board v. Robin American Corp., supra*. Another Fifth Circuit opinion, called to our attention by Fixtures after its brief was filed, indicates that that court may not have finally resolved the issue to its own satisfaction. *TRW, Inc. v. National Labor Relations Board*, 654 F.2d 307 (5th Cir. 1981), decided one week before *Robin American*, and by another panel.

The Sixth Circuit has not explicitly adopted *Wright Line*, but has intimated that it might do so. *Charge Card Ass'n v. National Labor Relations Board*, 653 F.2d 272 (6th Cir. 1981); *Na-*

Lindsey and Halterman were the two most active union advocates at Fixtures. Halterman initiated the unionization drive after he spoke with union representative Glenn Obermeier (Tr. 193–96). Between February 27 and March 1 he attempted to persuade numerous employees, including Lindsey, to join the union organizing committee (Tr. 111, 186–90, 229–32, 290–92). Lindsey agreed; he and Halterman met with Obermeier on the evening of March 1 and signed union authorization cards (Tr. 194–95).

■ There is ample direct and circumstantial evidence that by March 2 Polsky knew that Halterman and Lindsey had been engaging in union activity. Between February 27 and March 1, Lindsey and Halterman discussed unionization with other employees, while in the presence of Gary Pointer, Comptroller Pointer's son, and at least two supervisors (Tr. 111, 186–90, 229–32, 290–92). As we have noted, Polsky had instructed his supervisors to report on all union activity; other employees were encouraged to do so (Tr. 37). On the night of March 1, moreover, Night Supervisor Ken Capehart learned of union activity and left a report. His note was read by Polsky the following morning. Fixtures responded swiftly to the threat of unionization. Polsky fired Lindsey on March 3. On March 2 he ordered Halterman to take the polygraph test, and on March 6 Halterman was discharged.

Fixtures alleges that it fired Lindsey because he refused to cooperate in its investigation of in-shop thefts. Fixtures, however, has not shown that it would have fired him in the absence of the protected activity. Fixtures ordered Lindsey to take the polygraph test on February 21. Management first had reason to suspect that he was not fully cooperating no later than Monday, February 27, when Pointer read the results of the polygraph test. Pointer testified that he might have received and read the results as early as February 24 (Tr. 168).

Lindsey was fired at least four days later, on March 3, but only one day after the management had received a written report of union activity, and only two days after Lindsey had been most actively involved in union organizing. In short, the sequence of events is substantial evidence that Fixtures fired Lindsey for engaging in union activities, and that it would not otherwise have fired him.

■ Fixtures contends it would have subjected Halterman to the polygraph test, even if he had not engaged in union activities, because it suspected him of theft and vandalism, and that Halterman would have been fired in any event because of the theft in which the polygraph test allegedly implicated him. There is substantial evidence to the contrary. The sequence of events militates against Fixtures' contention. Polsky ordered Halterman to take the polygraph test on March 2, the very day that Fixtures received a written report on union activity and hard on the heels of Halterman's intensive union campaign. The thefts had ceased on February 17, the day Ralph Branson resigned (Resp. Ex. 2), and two weeks before Fixtures told Halterman to take the polygraph test.

It is hard to believe that Fixtures would have administered the test merely because someone spilled ink on an employee's book. Management officials testified that it was an intrusive test which they decided to employ in response to thefts which had been ongoing for several months (Tr. 41–42). In the context of this case, the Board acted within permissible limits in rejecting management's proffered explanation for subjecting Halterman to the test as contrived. The fact remains, however, that the ALJ found that the test results implicated Halterman in serious misconduct. We cannot agree with the Board's theory that Halterman's wrongdoing, however serious, is automatically immunized by the fact that the company gave him a polygraph test for an impermissible reason. *Berbiglia, Inc. v.*

tional Labor Relations Board v. Consolidated Freightways Corp., 651 F.2d 436 (6th Cir. 1981).

*NLRB*, 602 F.2d 839 (8th Cir. 1979), the only authority in this Court cited by the Board for this proposition, does not so hold, in our judgment. *Berbiglia* rested not only upon a finding that the company had an improper motive for instituting an investigation, but also upon a finding that, upon the whole record, the misconduct discovered by the company was not the real reason for the discharge. The latter issue of fact was not reached by the Board here. It may be true, as the Board argues, Brief p. 27, that "a searched-for 'valid' ground will not, in fact, be the *real* reason for a subsequent discharge," but we are unwilling to exalt that usually reasonable inference of fact into an inflexible rule of law. In other words, there may be instances of misconduct so serious that an employer is legally justified in dismissing an employee, no matter how that misconduct came to light. The ALJ thought this was such a case.

In this situation, the proper course is to remand the case for further proceedings as to Halterman. The Board should review the record and decide whether it agrees with the ALJ's finding that Halterman would have been discharged even in the absence of his union activity. Our own examination of the written report of the polygraph examiner, GCX 5, has left us in doubt as to its meaning, and the Board should have an opportunity, in the first instance, to express its view on that question. The exhibit, especially when viewed in the light of Halterman's explanation at the hearing, may not, even if accepted at face value, justify the ALJ's finding. We hesitate to reach that question ourselves without the benefit of the Board's judgment. It is for the Board to review the ALJ's findings in the first instance, not this Court.

The Board's order is enforced in full except as to Halterman. With respect to his case, the order is vacated, and the cause remanded for further proceedings not inconsistent with this opinion.

It is so ordered.