**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MARK I TUNE-UP CENTERS, INC., Respondent.**

No. 81–2317.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 18, 1982.

Decided Oct. 22, 1982.

William Wachter, Frederick Havard, Attys., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

Robert B. Vining, Jr., Clayton, Mo., for respondent.

Before HEANEY and BRIGHT, Circuit Judges, and HENLEY, Senior Circuit Judge.

PER CURIAM.

The National Labor Relations Board (NLRB) petitions this court for enforcement of its order against Mark I Tune-Up Centers, Inc. (Mark I). The NLRB determined that Mark I had violated sections 8(a)(1) and (3) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1) and (3), and ordered Mark I to cease and desist from unfair labor practices and to hold a new union representation election. Mark I argues that it committed no unfair labor practices and that enforcement of the NLRB's order should be denied. We enforce the NLRB's order in full.

I. *Background.*

Mark I operates a chain of automotive repair shops in the St. Louis metropolitan area. In early 1979, two unions[1] began a campaign to organize the mechanics employed by Mark I. After the unions had collected authorization cards from a majority of the employees, they petitioned for recognition. The NLRB conducted a representation election at Mark I on April 13 and 16, 1979, which resulted in a thirteen-to-three vote against the unions.

Following the election, the NLRB filed unfair practice charges and objections to the election against Mark I. After a consolidated hearing on all issues, Administrative Law Judge David P. McDonald determined that Mark I had violated sections 8(a)(1) and (3) of the Act by making unlawful threats at preelection meetings with the employees, coercively interrogating employees David Protte and James Hanner, unlawfully discharging employees Protte, George Brier, and Robert Spiess, giving Spiess an unearned bonus prior to the election, and illegally soliciting Hanner to maintain surveillance of union activity. On June 24, 1981, the NLRB adopted the administrative law judge's proposed cease and desist order and recommendation that a new election be conducted. The NLRB now petitions this court for enforcement of its order.

II. *Discussion.*

According to the applicable standard of review, we must enforce the Board's order if the Board correctly applied the law and if its findings are supported by substantial evidence in the record as a whole. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Mark I challenges the Board's order on four grounds, and we address them in turn.[2]

A. *Threats at Preelection Meetings.*

Prior to the election, Mark I held meetings at each of its shop locations to give its perspective on unionization to its employees. At each meeting, Manager Donald Schaeffer remarked that unionization might lead Mark I to close some of its shops, eliminate shop privileges, and impose more onerous working conditions. The Board decided that Schaeffer's remarks constituted threats in violation of section 8(a)(1) of the Act.

---

1. The two unions were the Automotive, Petroleum, and Allied Industries Employees Union Local 618, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and District 9, International Association of Machinists and Aerospace Workers, AFL–CIO.

2. Mark I has not challenged the Board's findings with respect to the bonus given to Spiess, the interrogation of Hanner, and the use of Hanner for surveillance of his fellow employees. Accordingly, we enforce the Board's order relating to those issues without further discussion.

In *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the United States Supreme Court observed that an employer's predictions about the effects of unionization must be "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization." *Id.* at 618, 89 S.Ct. at 1942. *See also R. J. Lallier Trucking v. NLRB,* 558 F.2d 1322, 1326–27 (8th Cir. 1977). Mark I argues that because Schaeffer couched his remarks in terms of the possible economic consequences of unionization, his remarks were lawful predictions and not threats. However, the Board found no objective basis for Schaeffer's predictions. Schaeffer's exact words are not reproduced in the record. However, after reviewing the record as a whole, we are not prepared to overturn the Board's characterization of his remarks as unlawful threats.

B. *Interrogation.*

██ Early in March 1979, Gary Lowry (the president of Mark I) spoke with David Protte on the telephone about a union meeting which Protte was planning to attend. According to Protte, Lowry said he would prefer it if Protte stayed away from the meeting. Lowry admitted making the call and inquiring about the meeting, but denied requesting Protte not to attend.[3] Mark I contends that this brief and isolated conversation was not a coercive interrogation.

This court takes five factors into account in analyzing coercive interrogation cases: "a history of employer hostility and discrimination, the nature of the information sought (*e.g.,* was the interrogator seeking information from which he could

take action against individual employees), the identity of the questioner (*i.e.,* what was the position of the company), the place and method of the interrogation, and the truthfulness of the reply (*e.g.,* did the interrogation inspire fear leading to evasive answers)." [*General Thermo, Inc. v. NLRB,* 664 F.2d 195, 197 (8th Cir. 1981), *quoting NLRB v. Ritchie Mfg. Co.,* 354 F.2d 90, 99 (8th Cir. 1965). When applied to the instant case, almost all of the factors support a finding of coercion.

First, the Board found that Protte himself had been a target of Mark I's animus toward unions in the past.[4] Next, Lowry's inquiry whether Protte was going to a union meeting should not be viewed as an idle request for harmless information, in view of the fact that Lowry specifically asked Protte not to attend the meeting. Furthermore, Lowry was president of Mark I, and his questioning of Protte produced evasive responses. The only factor operating in Lowry's favor is the innocuous nature of the place and method of interrogation, in that Lowry was attempting to call someone else when Protte answered the phone. We conclude that the record contains substantial evidence to justify the Board's finding that Lowry unlawfully interrogated Protte.

C. *Discharges.*

██ The Board determined that Mark I violated sections 8(a)(1) and (3) of the Act by discharging George Brier, David Protte, and Robert Spiess because of their union activities. Mark I gave business reasons for each termination, but the Board found the justifications to be pretextual. Mark I again argues on appeal that its discharges were legitimate. Although the issue is close, there is substantial evidence in the record as a whole to support the Board's conclusions with respect to each of the discharged employees.

---

3. The administrative law judge credited Protte's version and not Lowry's, a determination which we find no reason to disturb. *See NLRB v. Oil, Chemical and Atomic Workers International Union, Local 6–578,* 619 F.2d 708, 715 (8th Cir. 1980) (credibility determination entitled to deference absent extraordinary circumstances).

4. In 1977, Schaeffer discharged Protte after Protte began asking his fellow employees if they were interested in organizing. Protte was rehired a week later when he assured Lowry that his attitude toward union representation had changed.

Initially, the Board found that all three discharges occurred against a background of demonstrated antiunion activity on the part of Mark I, including coercive interrogations, illegal threats, and unlawful surveillance. Thus, when the Board found Mark I's business justifications for discharging three union ringleaders to be implausible, it concluded that the real reason was antipathy toward the unions.

George Brier, who began working for Mark I in 1974, went on sick leave in January of 1979 after suffering a back injury. Mark I discharged him on March 26, 1979, allegedly for failing to return to work when his latest medical work release expired. Brier testified that his doctor continued to send work release letters throughout March and April, but Mark I denied receiving them.

The administrative law judge credited Brier's testimony in finding that all the letters were sent to and received by Mark I.[5] Because Mark I had notice of Brier's continuing back problem, and because historically Mark I permitted employees with documented disabilities to remain on sick leave indefinitely, the Board concluded that the only reason for firing Brier was his union activity. We find no error in the Board's determination.

Mark I alleges that it discharged David Protte because it did not have a permanent opening for him. The Board found, however, that Mark I's business reason for discharging Protte was pretextual and that its real reason was antiunion sentiment. In making this determination, the Board relied on three facts: (1) that Protte was never told he was a temporary employee before he was laid off; (2) that he was not reinstated when Mark I advertised that it had an opening; and (3) that he was not reinstated when the man he was supposed to replace eventually left. We uphold the Board's determination.

Robert Spiess is the only one of the three employees who was allegedly discharged for poor work performance. The Board applied the *Wright Line*[6] test and found that Spiess' union activity was a motivating factor in his discharge, and that Mark I failed to show it would have taken the same action if Spiess had not been a union activist. Spiess was evidently a good mechanic but exhibited poor work habits and a bad attitude. There was, however, no evidence that his existing work habits and attitude had deteriorated prior to his discharge. On the contrary, the only proven change in his behavior was his union activities. In light of Mark I's demonstrated antipathy toward unions and its tolerance of Spiess' objectionable behavior prior to his involvement with the unions, we affirm the Board's finding that Mark I unlawfully discharged Spiess.

### D. *Coercive Remarks at the Election.*

■ Finally, Mark I argues that the allegedly coercive remarks made by Schaeffer to Protte[7] on the day of the election were not unlawful, because Schaeffer did not talk to Protte until after Protte had voted. The Board found that Brier also heard Schaeffer's remarks, and he had not yet voted. Thus, even if the remarks were too late to influence Protte, Brier's vote was still vulnerable to coercion. Accordingly, we uphold the Board's finding that Schaeffer's comments at the election, as well as his comments at the preelection meetings, were unlawfully coercive.

### III. *Conclusion.*

The NLRB applied the correct legal principles, and its findings of fact are supported by substantial evidence in the record as a whole. We note that many of the findings

---

5. Mark I has presented no extraordinary circumstances warranting rejection of this credibility determination. *See* note 3 *supra*.

6. *See Wright Line, a Division of Wright Line, Inc.,* 251 NLRB 1083, 1089 (1980), *enforced,* 662 F.2d 899 (1st Cir. 1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848

(1982). This court approved the *Wright Line* test in *NLRB v. Fixtures Mfg. Corp.,* 669 F.2d 547, 550 (8th Cir. 1982).

7. Protte testified that Schaeffer threatened to become an extremely hard-nosed manager and to cut benefits if the union won.

challenged by Mark I on this appeal depend on credibility determinations. Mark I has not given us sufficient reason to overturn either those determinations or any of the Board's other findings. The Board's order is enforced in full.