DeQUEEN GENERAL HOSPITAL,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 82–2247.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 15, 1983.
Decided Sept. 18, 1984.

William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for respondent.

John D. Davis, Coleman, Gantt, Ramsay & Cox, Pine Bluff, Ark., for petitioner.

Before LAY, Chief Judge, FAGG, Circuit Judge, and NICHOL,* Senior District Judge.

---

* The HONORABLE FRED J. NICHOL, Senior United States District Judge for the District of South Dakota, sitting by designation.

LAY, Chief Judge.

DeQueen General Hospital petitions this court to set aside an order of the National Labor Relations Board entered October 5, 1982, and the Board cross-petitions for enforcement of its order. The Board found that DeQueen committed numerous violations of sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3). DeQueen was ordered to cease and desist from engaging in a number of unfair labor practices, to offer immediate reinstatement to four employees who were discharged and to make them whole for any loss of earnings they suffered, to post appropriate notices, and lastly, to bargain with the Union. After a careful review of the record, we find that there is substantial evidence on the record as a whole to support the Board's order.

## I. BACKGROUND

In February of 1980, the Professional Division, Retail Clerks Union, Local 1583, United Food and Commercial Workers International Union, AFL-CIO, began an organizational campaign at DeQueen General Hospital. On March 18, 1980, the Union filed two representation petitions—one for a unit of registered nurses (Unit A) and one for a unit of all full-time and regular part-time technical employees (Unit B). At that time, the Union held signed authorization cards for 7 of the 13 employees in Unit A and for 93 of the 160 employees in Unit B. On May 7, 1980, an election was held in each unit, with the Union losing in Unit A by a margin of 7–5, and losing in Unit B by a margin of 94–49. The Union filed numerous unfair labor practice charges against DeQueen, calling into question its conduct both before and after the May 7 elections.

The charges were tried before an administrative law judge (ALJ), and after DeQueen filed timely objections to the ALJ's decision, the Board affirmed it with minor modifications. On appeal DeQueen challenges the Board's findings with respect to a number of the 8(a)(1) violations [1] and with respect to all four of the discharges. DeQueen further challenges the Board's issuance of a *Gissel* [2] bargaining order compelling it to bargain with the employees in Units A and B.

## II. SECTION 8(a)(1) UNFAIR LABOR PRACTICES

■ Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *." 29 U.S.C. § 157. Under section 8(a)(1) of the Act, it is an unfair labor practice for an employer to interfere with, restrain, or coerce an employee's exercise of section 7 rights. 29 U.S.C. § 158(a)(1). "In evaluating employer conduct * * * the test is not whether an attempt at [interference] has succeeded or failed, but whether 'the employer engaged in conduct which reasonably tends to interfere with, restrain, or coerce employees in the free exercise of their rights under Section 7.'" *NLRB v. Intertherm, Inc.*, 596 F.2d 267, 271 (8th Cir.1979) (quoting *Russell Stover Candies, Inc. v. NLRB*, 551 F.2d 204, 208 (8th Cir.1977)). As a reviewing court, we must enforce the Board's determination respecting 8(a)(1) violations if, in considering the record as a whole, the Board's findings are supported by substantial evidence. *Universal Camera Corp. v. Labor Board*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *NLRB v. Fixtures Manufacturing Corp.*, 669 F.2d 547, 550 (8th Cir.1982).

■ The Board determined that DeQueen violated section 8(a)(1) of the Act by: interrogating employees concerning their union membership, activities, and sympa-

---

**1.** A number of the 8(a)(1) violations found by the Board were not appealed and, thus, are not before us. Nonetheless, those violations affect the quantum of evidence upon which the Board based its finding of violations so pervasive that a bargaining order was justified.

**2.** *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 613–15, 89 S.Ct. 1918, 1939–40, 23 L.Ed.2d 547 (1969).

thies without assurances of nonreprisal and without a valid purpose, *see NLRB v. Mark I Tune-Up Centers, Inc.*, 691 F.2d 415, 417 (8th Cir.1982); *Intertherm*, 596 F.2d at 274 n. 2; *NLRB v. North American Manufacturing Co.*, 563 F.2d 894, 896 (8th Cir. 1977); threatening employees with or warning them of reprisals or discharges for their union activities, *see NLRB v. Ely's Foods Inc.*, 656 F.2d 290, 292 (8th Cir.1981); *Intertherm*, 596 F.2d at 274; threatening employees with closure of the hospital if a union is voted in, *see Mark I Tune-Up Centers*, 691 F.2d at 416–17; *Patsy Bee, Inc. v. NLRB*, 654 F.2d 515, 516–18 (8th Cir.1981); *R.J. Lallier Trucking v. NLRB*, 558 F.2d 1322, 1326–27 (8th Cir.1977); informing employees and creating the impression among employees that their union activities are under surveillance, *see NLRB v. Chem Fab Corp.*, 691 F.2d 1252, 1258 (8th Cir.1982); informing an employee that the employee was being reprimanded because of union activities, *see NLRB v. Hitchiner Manufacturing Co.*, 634 F.2d 1110, 1113 (8th Cir.1980); informing employees that bargaining will be from scratch and that any benefits negotiated would not be as good as benefits already enjoyed by the employees, *see NLRB v. Suburban Ford, Inc.*, 646 F.2d 1244, 1247–49 (8th Cir.1981); *Hitchiner Manufacturing*, 634 F.2d at 1113; promising employees better working conditions and increased benefits if they stop the union elections or if they do not file objections to the election results, *see NLRB v. Rexall Corp.*, 725 F.2d 74, 76–77 (8th Cir.1984); *Ely's Foods*, 656 F.2d at 292; *Suburban Ford*, 646 F.2d at 1247–49; and finally, by issuing a personnel policy and procedural manual that included a rule prohibiting employees from engaging in activities other than assigned duties, *see NLRB v. Speed Queen*, 469 F.2d 189, 192–93 (8th Cir.1972); *Jas. H. Matthews & Co. v. NLRB*, 354 F.2d 432, 440–41 (8th Cir.1966).

We find it unnecessary specifically to detail the record testimony supporting the Board's unfair labor practice findings under section 8(a)(1) of the Act. After carefully reviewing the record as a whole, we find substantial support for the Board's findings.

## III. DISCHARGES

Under section 8(a)(3) of the Act, it is an unfair labor practice for an employer "to encourage or discourage membership in any labor organization" by discrimination in hire or tenure. 29 U.S.C. § 158(a)(3). The Board determined that DeQueen violated sections 8(a)(1) and (3) of the Act by discharging union activists Pat Harris, Mary Margaret Neumeier, Doris Stultz, and Univee Bryson and by reprimanding employee Anita Turner. We find substantial evidence in the record as a whole to support the Board's findings with respect to the 8(a)(3) violations.

Initially, we note that the discharges and Turner's reprimand occurred against a background of demonstrated anti-union animus, including coercive interrogations, threats of reprisal or discharge for engaging in union activities, illegal surveillance, and threats of hospital closure if a union was voted in. The record testimony indicates that hospital administrator Pearce instructed supervisory personnel to use any excuse to "get rid of" union supporters. DeQueen's top management and supervisory personnel were clearly aware that Harris, Neumeier, Stultz, and Bryson were strong union supporters who played an active role in the union's organizational campaign.

### A. The 8(a)(3) violations

In *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the Supreme Court approved the Board's application of the *Wright Line* test in "dual motive" discharge cases. Under the *Wright Line* test, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), the General Counsel has the burden of proving that the employee's protected conduct was a substantial or a motivating factor in the discharge decision. *Transportation Management Corp.*, 103 S.Ct. at 2473. An employer can "avoid being held

in violation of §§ 8(a)(1) and 8(a)(3) [of the Act] by proving by a preponderance of the evidence that the discharge rested on the employee's unprotected conduct as well and that the employee would have lost his job in any event." *Id.* While the *Wright Line* test extends to the employer what the Board considers to be an affirmative defense, it "does not change or add to the elements of the unfair labor practice that the General Counsel has the burden of proving * * *." *Id.* at 2474.

### 1. Harris

DeQueen alleged that employee Harris, after accepting full-time employment at a nursing home, resigned her full-time position at the hospital and reapplied for unavailable part-time employment. The Board rejected DeQueen's position, finding instead that Harris was fired for having engaged in protected section 7 activity.

■ On June 15 Harris submitted a written request to her supervisor stating that she "would like to change from permanent full-time status to permanent part-time status starting on the next work sheet." On June 23, Harris's supervisor informed her that her "resignation" of full-time employment effective June 28, 1980, had been accepted and that there were no permanent part-time positions available. The ALJ concluded that "it [was] absurd to [assert] that an employee who requests part-time work is in effect giving the employer an ultimatum that if part-time employment is not granted [she] is resigning." We agree, and consequently find no error in the Board's determination that employee Harris was fired for having engaged in protected section 7 activities.

### 2. Neumeier

DeQueen alleged that employee Neumeier was lawfully fired after receiving her third reprimand for violating hospital rules. The Board determined that the reprimands were issued because of Neumeier's union activities in order to rid the hospital of a leading union adherent.

■ Neumeier, an employee of DeQueen for approximately 15 years, received her first reprimand from the hospital on March 20, just two days after the Union filed its representation petitions with the NLRB. At that time, supervisor Dick Jones warned Neumeier that as long as she associated with people whom management thought were for the union, she was going to get in trouble. Neumeier received a second reprimand on June 24 for loafing on the job. Another employee present at the time, who was a known anti-union employee, was not reprimanded nor was any report of the incident made to his supervisor. Neumeier was terminated on August 11 after receiving her third reprimand, this time for insubordination. After carefully reviewing the record, we affirm the Board's determination that Neumeier was reprimanded and eventually terminated for engaging in activities protected by section 7. Additionally, we agree that employee Anita Turner was a victim of DeQueen's discrimination against Neumeier and that the reprimand she received was given in violation of sections 8(a)(1) and (3) of the Act.

### 3. Bryson

Bryson had worked as a nurses aide and had been accepted to go to licensed practical nurses school. She made inquiries about obtaining CETA funds while she was going to school. She was told by a CETA representative she would have to be unemployed for one week before she could apply for CETA funds. She testified that she had been told by another nurse that she could obtain CETA funds while attending school and still work if supervisor Dossett would give his consent and state that she was unemployed at the time.

Bryson thereafter attempted to discuss the problem with the hospital administrator and supervisor Dossett. Since they were unavailable, she talked to Kenneth Moore, the Hospital Controller. The ALJ found that Moore discussed the problem with Bryson and asked her what day she wanted to say she had quit. Moore wrote down the day selected and told her if anyone

called he would tell them that she was not employed. (Moore also told Bryson he was glad she was not going to quit because they were shorthanded). Later Bryson found out from the CETA office she was not eligible for CETA funds since she had made too much money during the year. The ALJ found that she called Moore and told him and Moore responded that he was sorry but at least "they had tried."

Moore's testimony was that he did not understand what Bryson wanted and that he would have to check it out. He stated he called the employment security office to report the matter. He then found out that Bryson had filled out a CETA application and had stated she had quit her job at the hospital on July 28. Moore notified Bryson's supervisor and the next day the supervisor presented Bryson a termination slip on the basis of "dishonesty."

Although the ALJ indicated he could not condone Bryson's misrepresentation, he found that Bryson was not discharged for the reason given but for her union activities. He attributed his finding to the undisputed evidence that Bryson's supervisor, Montezuma, had earlier heard Bryson had been selected for discharge because of her union activities. The record shows Bryson had been labeled by Administrator Pearce as a union "ringleader" and troublemaker. The record also shows that Pearce told his supervisors to be rough on employees and should any reason arise to get rid of an employee to use that opportunity. The ALJ observed that the hospital had not established that Bryson would have been discharged absent the union activities. Although Moore and Bryson's stories differ, the record shows that Moore did not reprimand Bryson concerning the CETA application when he was first approached, rather he simply stated he would check into it. Bryson did not receive any CETA funds.

When the Board is faced with conflicting testimony, it is the sole prerogative of the ALJ to make credibility findings. This court must assess the record on the basis of whether substantial evidence, on the record as a whole, supports the Board's findings. In evaluating the record in this light we are admonished to give weight to the ALJ's finding and not to substitute our own factfinding for that of the Board. *Universal Camera*, 340 U.S. at 488, 490, 71 S.Ct. at 464, 465. Under the record presented here we have no difficulty in upholding the Board's finding that Bryson's discharge was a violation of 8(a)(3) of the Act.

### 4. Stultz

Employee Stultz worked at the hospital for approximately four years prior to separation on June 13. She was a paramedic in the ambulance department. As with the other three employees discharged, Stultz had been identified as a union ringleader and placed on Pearce's list for termination. Stultz participated in the union organizational campaign and was an active card solicitor. Her activities were well known by Administrator Pearce and her supervisor, Ronnie Turner.

On or about May 14 Stultz asked her supervisor if she could get two weeks paid vacation and at the same time give two weeks notice of separation. She said she was thinking about going somewhere else to work. Her supervisor said she would check it out and let her know. A week later Turner told her they could work it out and Turner said she would leave on June 13. (Stultz says the date was June 17). On May 20 Stultz told Turner she had changed her mind and did not want to quit. Turner then met with Pearce and they decided they would not allow her to change her mind because she had "a bad attitude."

Pearce testified his decision was also based in part on the fact that Stultz had been told in 1979 she could not drive ambulances because her insurance was cancelled; Pearce stated he found out that she had in fact been driving ambulances on several occasions despite the hospital's request. The record shows the last time she drove an ambulance without the hospital's approval was before February, 1980.

On June 4 when Stultz picked up her check she found that she received her two weeks paid vacation. She returned it with a letter stating she did not wish to quit. Turner simply told her she had quit and returned the letter to her. Later Turner told her if she continued to pursue the matter about quitting he had witnesses who would verify she had illegally driven the ambulance. She asked Turner if she was being fired and he answered "no." However, on June 13, after Stultz had notified the hospital in writing she did not wish to quit and wanted her check corrected, she was given a termination slip. Pearce testified that Stultz's resignation would not be rescinded because (1) a replacement had already been hired and (2) he had learned that she was driving the ambulance.

The ALJ, in holding that the discharge violated 8(a)(3), found that (1) Stultz was targeted by Pearce as a union ringleader and troublemaker; (2) in her termination report Stultz was classified as being a "poor" employee because of her lack of cooperation, hospital spirit and loyalty; (3) the finding of lack of cooperation and loyalty stems from the fact that Stultz supported the Union; (4) there existed no reasonable basis for the hospital to refuse to allow Stultz to rescind her proposed resignation; (5) no transfer of other employees as replacements were effected when she was terminated; (6) the report that Stultz had a bad attitude is contradicted by testimony of Turner and Pearce that she was a good worker; (7) evidence is highly suspect that Pearce knew before Stultz's resignation that she had wrongfully driven the ambulance; (8) respondent had failed to sustain the burden of establishing that Stultz would have been terminated regardless of her union activities.

■ Once again we are faced with a record containing conflicting evidence in which the ALJ has made certain credibility findings. We find, reviewing the record as a whole, that there exists substantial evidence to support the Board's finding. The overall hostility of the company against the Union, the threats, illegal promises and

other unfair labor practices cannot be ignored in weighing the reasons proferred by the company for the discharges. Under the circumstances we are highly reluctant to substitute our judgment for the findings of the ALJ and the Board.

## B.  Bargaining order

DeQueen contends that the Board improperly ordered it to bargain with the employees in Units A and B. In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court held that an employer can be ordered to bargain with a union in a case in which (1) the union achieved majority support within an appropriate bargaining unit, *id.* at 614, 89 S.Ct. at 1940; (2) the employer engaged in unfair labor practices which "still have the tendency to undermine majority strength and impede the election process," *id.*; and (3) "the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair return) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through [authorization] cards would, on balance, be better protected by a bargaining order," *id.* at 614–15, 89 S.Ct. at 1940. *See also Ely's Foods*, 656 F.2d at 293; *Patsy Bee*, 654 F.2d at 518.

The Board, in approving the bargaining order, made the following findings:

[B]eginning in early March, [the Hospital] engaged in a campaign of interrogating its employees regarding their Union membership activities and sympathies, and threatened employees with trouble with the [Hospital] because of their Union activities. [T]his conduct occurred both before and after the filing of the representation petition. Additionally, * * * the [Hospital] threatened its employees with * * * closure [of the Hospital]; * * * gave the impression to its employees that their Union activities were under surveillance and threatened employees with discharge if they talked about the Union. These unfair labor practices continued following the filing

of the petition, and after the election. Also following the election the [Hospital] began to issue warnings to its employees, some of which were predicated upon the [Hospital's] illegal rule prohibiting employees from engaging in activities other than assigned duties, which [was] found to be violative of Section (8)(a)(1) of the Act. Also following the election the [Hospital] discharged four employees because of their Union activities in order to discourage the remaining employees from engaging in Union activities in the future * * *. [This is] one of the most flagrant means by which employers can hope to dissuade employees from selecting a union as their bargaining representative because no other event can have more crippling consequences to the exercise of the rights guaranteed by Section 7 than the los[s] of employment.

■ In view of the above findings we have no difficulty in holding that the hospital's unlawful conduct was pervasive and adversely affected the election. In Unit B the Union obtained 93 valid authorization cards out of 160 before the election. Yet the Union lost the election by a substantial margin (94–49). It should be clear the Union's majority support, at least in Unit B, was dissipated and, in our judgment, there was no possibility of a fair re-run election. Although Unit A contained only 13 employees, and the Union lost by 7–5, we agree with the Board's finding the unfair labor practices of the company were pervasive and created an atmosphere in which it would be virtually impossible to have a fair election.

As this court stated in *Tipton Electric Co. v. NLRB*, 621 F.2d 890, 899 (1980):

[When] unfair labor practices clearly ha[ve] the effect of undermining strength and destroying the laboratory conditions necessary for a fair election [,t]he damage ha[s] been done and the only fair way to guarantee the employees' rights [is] to reestablish the conditions that existed before the employer['s] unlawful campaign.

■ Where an employee signs a single-purpose card stating clearly and unambiguously that the employee designates a union as his or her representative for purposes of collective bargaining, the card presumptively counts as indicating support for the union. The cards contained the name of the Union and, in bold face type, "AUTHORIZATION FOR REPRESENTATION." Above the line designated for signature the cards stated: "I hereby authorize the United Food & Commercial Workers International Union, AFL-CIO-CLC, or its chartered Local Union(s) to represent me for the purpose of collective bargaining." An exception exists where the employer can show that the language on the card was "deliberately and clearly cancelled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature." *Gissel*, 395 U.S. at 606, 89 S.Ct. at 1936. *See Hitchiner Manufacturing*, 634 F.2d at 1115; *Tipton Electric*, 621 F.2d at 895. This court has recognized that it is within the special province of the Board to evaluate the effect, in a particular case, of an employer's unfair labor practices. *Ely's Foods*, 656 F.2d at 293. As stated in *Gissel*, 395 U.S. at 612 n. 32, 89 S.Ct. at 1939 n. 32, "[T]he Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts."

The hospital argues that the *Gissel* order should not be enforced because some of the authorization cards were not valid as to employees in Unit A. DeQueen does not question the Union's support in Unit B.

■ Employees Mowatt, McElroy, and Grantham signed unambiguous single-purpose cards authorizing the Union to represent them "for the purpose of collective bargaining." The evidence presented to the Board fails to show that union activists misrepresented to these employees the purpose for which the authorization cards would be used. Our review leads us to conclude that the challenged authorization cards are valid; consequently, the Union

achieved majority support in both bargaining units.[3]

Because we find substantial evidence on the record as a whole, the Board's order must be affirmed.

FAGG, Circuit Judge, dissenting.

Because I do not believe that the record supports the Board's issuance of a bargaining order, I dissent from the portion of the court's opinion enforcing the bargaining order issued for Units A and B.

As the court recognizes, one of the prerequisites to the proper issuance of a *Gissel* bargaining order is majority support for the Union within a given bargaining unit. The Board determined that the Union held valid authorization cards for 7 of the 13 employees in bargaining Unit A, thus giving the Union majority support in that unit. In my view, the authorization card of employee Mary Mowatt is invalid, and consequently I reject the Board's conclusion that the Union achieved majority support in bargaining Unit A.

Mary Mowatt did not testify before the ALJ. Rather, the only insight as to whether the language of the authorization card was "deliberately and clearly cancelled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature," *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 606, 89 S.Ct. 1918, 1936, 23 L.Ed.2d 547 (1969), is provided by the testimony of Mowatt's husband, Steve Mowatt. The authorization card signed by Mary Mowatt specifically provides that she authorizes the Union "to represent me for the purpose of collective bargaining." As the court indicates, when Steve Mowatt, a union supporter, explained the purpose of the card to his wife, he told her she should sign it if she wanted to know more about the union. His explanation did not end there, however. Mowatt testified that he told Mary Mowatt that the card "was not for an election or a vote, or for representation, just to hear more about a Union." The plain language of Steve Mowatt's statement to his wife that the card was not for representation cancels the language of the authorization card to the contrary. The Board's determination that Mary Mowatt's authorization card is valid is not supported by substantial evidence.

I would also not enforce the Board's issuance of a bargaining order for Unit B. Initially, I note my disagreement with the court's upholding of the Board's findings with respect to the discharges of Unit B employees Bryson and Stultz. In my opinion, DeQueen has proven by a preponderance of the evidence that the discharge of employee Bryson and the refusal to reinstate employee Stultz would have occurred even in the absence of their protected section 7 conduct. Bryson was discharged for attempting to involve DeQueen management personnel in her scheme dishonestly to obtain CETA funds. The refusal to reinstate Stultz, who voluntarily quit and then attempted to rescind her resignation, re-

---

**3.** The dissent takes issue with the validity of the card of Mary Mowatt. It argues Mary Mowatt's husband, Steve, told her that the card was not for union representation. This misreads the record. Mary Mowatt was given a card by her husband and he told her she should sign it if she wanted to know more about the Union. This statement does not contravene or misrepresent the plain meaning of the card. This statement does not prove that the purpose of the card was to obtain an election. Once again we must credit the finding of the ALJ. The card states clearly that the employee authorizes the Union to represent the employee for purposes of collective bargaining. The burden to set aside a card on the ground of misrepresentation is much greater than that shown by DeQueen. In assessing Steve Mowatt's testimony we also re-

peat the Supreme Court's observation made in *Gissel:* "employees are more likely than not, many months after a card drive and in response to questions by company counsel, to give testimony damaging to the union, particularly where company officials have previously threatened reprisals for union activity in violation of Section 8(a)(1)." *Gissel,* 395 U.S. at 608, 89 S.Ct. at 1937.

The dissent also asserts that the Board failed to adequately articulate the reasons necessitating a *Gissel* order. However, the ALJ outlined DeQueen's unfair practices and illegal actions in great detail and specifically found that the "anti-union campaign * * * fatally impedes the election process and warrants the issuance of a bargaining order." This conclusion was adopted by the Board after careful review.

sulted from Stultz' driving of the ambulance on several occasions after the insurance covering her was cancelled because of a poor driving record. Following the cancellation of insurance, Stultz had been specifically informed that any future driving of the ambulance would be grounds for her dismissal. Stultz readily admits that she drove the ambulance on several occasions after the cancellation of insurance. *See NLRB v. Mount Desert Island Hospital*, 695 F.2d 634, 639 (1st Cir.1982) ("The *Wright Line* standard is equally apposite to refusal to rehire cases when competing motivations are alleged.").

After carefully reviewing the record, I cannot conclude that "the possibility of erasing the effects of past practices and of ensuring a fair [rerun] election * * * by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order" for Unit B. *NLRB v. Gissel Packing Co., supra*, 395 U.S. at 614–15, 89 S.Ct. at 1940. First, the Union suffered an overwhelming defeat of 94–49 in the May 7 election. Second, the greatest share of unfair labor practices committed by the hospital was directed at Unit A employees. Third, the Board failed adequately to articulate the reasons necessitating a bargaining order for this unit. Specifically, the Board failed to "undertake a detailed analysis assessing the possibilities of holding a fair election in terms of any continuing effect of employer misconduct, the likelihood of recurring misconduct, and the potential effectiveness of traditional remedies." *NLRB v. Ely's Foods Inc.*, 656 F.2d 290, 294 (1981) (McManus, C.J., N.D.Ia., concurring specially) (citing *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108, 1118 (7th Cir. 1973)).

Although I do not believe a bargaining order was properly issued for Unit B employees, I would, at the very least, remand to the Board with directions to articulate the reasons necessitating a bargaining order in this unit.