NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

The BROYHILL COMPANY, Respondent.

No. 74–1519.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 10, 1975.

Decided May 1, 1975.

David S. Fishback, Atty., N. L. R. B., Washington, D. C., for petitioner; Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Alan D. Cirker and David S. Fishback, Attys., N. L. R. B., Washington, D. C., on the brief.

William H. Bruckner, Houston, Tex., for respondent.

Before BRIGHT and STEPHENSON, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

STEPHENSON, Circuit Judge.

This application for enforcement of the Board's order, 210 NLRB No. 37, and the Company's response thereto, presents the question of whether substantial evidence on the record as a whole supports the Board's findings[1] that (1) the Company violated section 8(a)(1) of the Act by solicitation of grievances, coercive interrogation of its employees, and threats of plant closure;[2] (2) Charles McWilliams was a supervisor within the meaning of the Act; and (3) the Company violated section 8(a)(3) and (1) of the Act by discharging employees Rupe and Macias for their union activities. We enforce the Board order.

The Broyhill Company, a Nebraska corporation, is engaged in the business of manufacturing and distributing agricul-

---

* The Honorable Talbot Smith, Senior District Judge for the Eastern District of Michigan, sitting by designation.

1. The Board affirmed the rulings, findings and conclusions of the Administrative Law Judge and adopted his recommended order with respect to the matters here under consideration.

2. The Company in this appeal does not urge reversal of the Board's findings with respect to

employee interrogation by Supervisor Ralph Schroeder and Supervisor Roger Miller but challenges the findings involving the supervisory status of Charles McWilliams and the discharges of Roy Macias and Donald Rupe. The 8(a)(1) violations furnish important background to the other violations and will therefore be included in our discussion.

tural, industrial, and turf equipment. Because of the seasonal nature of the Company's business, the greatest number of customer orders are received during March through May. These orders must be processed quickly as orders shipped after mid-May are subject to cancellation. The Company's Dakota City facilities include an assembly department, where 12 to 15 workers are employed under the supervision of Ralph Schroeder.

In late March 1973 a unionization campaign was initiated by several employees.[3] During this campaign employees distributed handbills, solicited signatures to union authorization cards, wore union buttons, and held union meetings. On May 7, 1973 an unfair labor practice petition was filed in response to certain Company activity, and on April 29, 1974 the Board found that the Company had violated section 8(a)(1) and (3) of the Act.[4] The facts of each violation will be discussed as pertinent.

## I. SECTION 8(a)(1) VIOLATIONS

We find substantial evidence upon this record as a whole to support the Board's determination that section 8(a)(1) of the Act was violated. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ Shortly after the representation petition was filed, on April 19, 1973, an unidentified Company official conducted a meeting for the employees wherein the Company outlined its version of what it could do for the employees as compared to the Union. In immediate follow-up to this meeting, Supervisor Schroeder announced to the employees that anyone who had complaints or wanted to discuss "what the Company could do" should come to his office. Availing themselves of this opportunity, Donald Rupe and Kent Eldridge presented to Schroeder complaints concerning gasoline fumes in the plant. Schroeder assured them that the problem would be solved. When Rupe returned to Schroeder's office two days later because the problem had not been solved, no excuse was given. Instead, Schroeder challenged Rupe's pro-union statements that the Union could do more for the employees than the Company and referred to the Union representatives as "crooks." It is obvious that the solicitation of employee grievances with promises to correct them was done for the purpose of discouraging unionization. H. L. Meyer Co. v. N.L.R.B., 426 F.2d 1090, 1093 (8th Cir. 1970).

■ On subsequent occasions both Schroeder and Foreman Charles McWilliams,[5] individually, interrogated Rupe regarding the Union's prospects of success, the extent of authorization cards solicited, whether or not Union meetings had been held, and the extent of employee attendance. Supervisor Ralph Miller similarly questioned another employee, Douglas Freeman. During one of the McWilliams-Rupe conversations after April 30,[6] McWilliams warned that "if the Union ever tried to get in," the Company would close. He also told Freeman that the Company "had shut down over the union 15 years ago." This type of interrogation and warning is unlawful. Federal Prescription Service, Inc. v. N.L.R.B., 496 F.2d 813, 815 (8th Cir. 1974); N.L.R.B. v. Spotlight Co., 440 F.2d 928, 930 (8th Cir. 1971);

---

3. The unionization campaign was by District Lodge No. 162, International Association of Machinists and Aerospace Workers, AFL–CIO (hereinafter referred to as the "Union").

4. 29 U.S.C. § 158(a)(1) and (3).

5. Assuming arguendo that McWilliams was not a supervisor within the meaning of the Act, it is clear from the evidence that other employees felt that he was their "boss" and that the Company had placed him in a position where employees could reasonably believe that he spoke and acted on behalf of management.

Because of this connection with the management of the Company, his conduct is imputed to it. It therefore is appropriate evidence which must be considered in connection with the section 8(a)(1) violation. See N.L.R.B. v. Dayton Motels, Inc., 474 F.2d 328 (6th Cir. 1973); N.L.R.B. v. Solo Cup Co., 237 F.2d 521, 523–24 (8th Cir. 1956).

6. On April 30 Rupe and three other employees distributed union handbills at the plant gates. Supervisor Schroeder and McWilliams personally observed this activity.

N.L.R.B. v. Midwest Hanger Co. & Liberty Engineering Corp., 474 F.2d 1155, 1160–61 (8th Cir. 1973).

We are convinced that the Company's anti-Union animus was amply established and that there is substantial evidence to warrant the Board's finding that the Company violated section 8(a)(1) of the Act.

## II. SUPERVISORY STATUS OF McWILLIAMS

Section 2(11) of the Act, 29 U.S.C. § 152(11), defines "supervisor" as:

\* \* \* any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

■ This section is to be interpreted in the disjunctive; possession of any one of the authorities listed justifies a determination that the holder thereof be classified as a supervisor. N.L.R.B. v. Sayers Printing Co., 453 F.2d 810 (8th Cir. 1971); Jas. H. Matthews & Co. v. N.L.R.B., 354 F.2d 432, 434–35 (8th Cir. 1966), cert. denied, 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015. The determination of who is a supervisor is a fact question and a matter of practical application by the Board to the infinite gradations of authority within a particular industry. N.L.R.B. v. Swift & Co., 292 F.2d 561, 563 (1st Cir. 1961). The Board will therefore be afforded " 'a large measure of informed discretion.' " N.L.R.B. v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1089 (8th Cir. 1969). Its determination will be accepted if it has " 'warrant in the record' and a reasonable basis in law." Jas. H. Matthews & Co. v. N.L.R.B., supra at 435; cf. N.L.R.B. v. Sayers Printing Co., supra.

■ It is apparent that McWilliams did not have authority to hire, fire, grant time off, reward, or discipline employees; nor could he make effective recommendations in these matters. However, there is substantial evidence in the record to support the Board's finding that he exercised independent judgment with respect to assigning and responsibly directing assembly employees and that he did so in more than a routine fashion.

McWilliams jointly participated with Lee Carter in the preparation of daily work schedules of each employee. McWilliams would then assign work projects to each employee throughout the day. When a task was completed, the employee was required to report then to McWilliams for another assignment. In addition, new employees hired to work in the assembly department were directed to report to McWilliams. He would then orient them to the production process and assign their tasks. It was also McWilliams' responsibility to see that each employee performed his job properly and diligently. On occasion he would reprimand and criticize employees for their poor work performance.

Against this evidence we weigh the Company's contention that McWilliams was a line foreman whose authority was merely of a routine nature. Although the issue is highly disputed, we are satisfied with the Board's determination of his supervisory status. See also discussion supra, note 5.

## III. SECTION 8(a)(3) AND (1) VIOLATIONS

A. Donald Rupe had been hired on February 1, 1973, assigned to the assembly department, and, pursuant to Company policy for all new employees, placed on 30-day probation. Rupe's probationary period passed unnoticed, and not until April 16 was he given a review. The review was conducted by Supervisor Ralph Schroeder and Lee Carter before the Union had filed its representation petition. Rupe was given a rating of "Good" in cooperation and "Average" in dependability, output, adaptability, and

accuracy. He was personally told that he was "doing real good" and was given a five-cent per hour raise. Although this raise was apparently less than the norm, there is no evidence that the Company was dissatisfied with Rupe's work performance before April 19.

After April 19, during the two and one-half weeks prior to his discharge, Rupe was given several reprimands for slow work performance and for assisting a colleague in the completion of the latter's assigned task. On April 30 and on the last three days before his discharge, he was given similar reprimands, and written reports were placed in his file. Without any prior warning that his work performance might cause him to be discharged, he was fired on May 3, 1973.

The evidence indicates that Rupe was very active in the unionization campaign; he signed and solicited other employee signatures to authorization cards; he wore a large union button, frequented union meetings, voiced several pro-union sentiments to management personnel, and was the brother-in-law of a union representative. Supervisor Schroeder and McWilliams were well aware of Rupe's union activities. On April 30 Rupe's position as a leading union advocate was made abundantly clear to all. On that date he distributed union handbills before the start of work at the plant's front main gate.

Although an election had not been held before Rupe's discharge, it is apparent that the Company's growing disfavor with Rupe's work performance paralleled the progress of the Union's campaign and Rupe's activity therein. Viewed in light of the Company's obvious anti-union animus, the Board found that Rupe was discharged in violation of section 8(a)(3) and (1) of the Act.

The Board's determination must also be viewed in light of the Company's contention that it knew of Rupe's union sympathies when it gave him a raise on April 16 and that it was because of Rupe's slow work performance in the last few weeks of April and early May that Schroeder fired Rupe.[7] Although these are mitigating factors, we are convinced that there is substantial evidence to support the Board's findings.

Rupe's sudden discharge came in the midst of the Company's busiest season; production was at a premium, and employees were asked to work overtime. Further, it was admitted that any employee replacement would not be able to perform as efficiently. Moreover, this discharge contrasts sharply with a previous incident involving other employees where the Company deferred discharges of several slow-working employees because of the need to get the work out.

The record is replete with substantial evidence in support of the Board's determination and therefore will be sustained. Federal Prescription Service, Inc. v. N.L.R.B., *supra.*

B. Ray Macias' discharge is also sharply disputed. However, the Board's determination that his discharge was in violation of section 8(a)(3) and (1) is supported by substantial evidence.

Macias was hired on March 21, 1973 and, as Rupe, was given a performance review after his 30-day probation. He was rated "Good" in dependability and cooperation and "Average" in output, adaptability, and accuracy. Schroeder testified that he considered Macias' performance "a little better" than Rupe's; however, Macias also received only a five-cent per hour raise.

Macias was likewise a strong union advocate, and on April 30 he accompanied Rupe in the distribution of union handbills at the plant's front gate. On May 4 Macias was discharged.

The Company asserts that the discharge was due to the fact that Macias refused to work mandatory overtime. The record discloses contradictory evidence as to whether or not overtime was mandatory and, if it was, whether or not Macias knew or should have known that

---

**7.** It is evident that Schroeder had received an intra-company directive to increase production due to the large number of customer orders.

**660**

his decision not to work the full overtime jeopardized his employment.

There appeared to be no general Company policy concerning mandatory overtime. On at least two occasions management personnel observed Macias leaving the job without putting in a full hour of overtime but failed to warn him of the consequences of not working overtime. Under all the circumstances, the Company's justification for discharging Macias appears to be pretextual. Assuming arguendo that his discharge was in part motivated by the asserted reason, there is sufficient evidence to support the Board's finding of wrongful discharge. McGraw-Edison Co. v. N.L.R.B., 419 F.2d 67 (8th Cir. 1969).

The Board order is enforced.