**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CHEM FAB CORPORATION, Respondent.**

**No. 81–2316.**

United States Court of Appeals, Eighth Circuit.

Argued June 14, 1982.

Decided Nov. 1, 1982.

---

Robert C.D. McDonald, Atlanta, Ga., for Chem Fab Corp.

W. Christian Schumann, Corinna Lothar Metcalf, Attys., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for N.L.R.B.

Before LAY, Chief Judge, and GIBSON, Circuit Judge and FAIRCHILD *, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Chem Fab Corporation (the Company) asks us to review and set aside an order of the National Labor Relations Board (the Board). The Board requests us to enforce the order. The order is reported at 257 N.L.R.B. 996 (1981).

The relevant activities occurred at the Company's Central Street plant and its nearby Nevada Street plant in Hot Springs, Arkansas. They took place during a Union organizing effort and election campaign, in the second half of March and throughout April, 1980.

On March 21 Ronald Reagan, President of Chem Fab Corporation, met John Stephens, a Central Street employee, soliciting Union support during his lunch hour at the Nevada Street plant. Reagan then and there promulgated a rule against fraternization between the workers at the two plants. Selective enforcement based on Union activity was found to be a § 8(a)(1) unfair labor practice. This finding is not contested by the Company. The Company also does not contest a finding of a § 8(a)(1) unfair labor practice by issuing warnings to three employees for talking to fellow employees about the Union during working time.

The Company does take issue with the following:

The finding that Wade Ross, the "lead leadman" on the night shift at the Nevada Street plant was a supervisor, that he made certain statements, and that the statements were coercive and therefore § 8(a)(1) unfair labor practices.

The finding that the rule, announced by Reagan during a speech on April 9, that employees are not to talk to each other about the Union during working time was a § 8(a)(1) unfair labor practice.

The findings that statements, largely in Reagan's speeches, were impliedly threatening and coercive.

The findings that the transfer and discharge of Central Street employee John Stephens (apparently the most active and vocal Union advocate) were unlawfully discriminatory and § 8(a)(1) and (3) unfair labor practices.

The finding that the discharge of Nevada Street employee John Stewart (a very open supporter of the Union) was unlawfully discriminatory and a § 8(a)(1) and (3) unfair labor practice.

The rejection of the Company's claim that Stephens was disqualified for reinstatement because of alleged sales of marijuana in the plant.

Much of the relevant evidence is set forth or summarized in the ALJ's decision, and need not be repeated here. We conclude

* Thomas E. Fairchild, Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation.

that there is substantial evidence in the light of the record as a whole to support the findings.

The ALJ's decision clearly disposes of the Company's argument regarding the rule against talking about the Union, *see Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803–804 n. 10, 65 S.Ct. 982, 988 n. 10, 89 L.Ed. 1372 (1945); *Gerry's Cash Markets, Inc. v. NLRB*, 602 F.2d 1021, 1024–25 (1st Cir. 1979), the instruction to report Union activists, *see Bank of St. Louis v. NLRB*, 456 F.2d 1234, 1235 (8th Cir. 1972), the request that employees obtain their authorization cards back from the Union, *see NLRB v. Deutsch Co.*, 445 F.2d 902, 906 (9th Cir. 1971), *cert. denied*, 405 U.S. 988, 92 S.Ct. 1248, 31 L.Ed.2d 454 (1972); *Amalgamated Clothing Workers of America v. NLRB*, 424 F.2d 818, 824 (D.C.Cir.1970), and the various threats made by Company President Reagan, *see Patsy Bee, Inc. v. NLRB*, 654 F.2d 515 (8th Cir. 1981); *NLRB v. Saunders Leasing Systems, Inc.*, 497 F.2d 453 (8th Cir. 1974); *NLRB v. Crystal Tire Co.*, 410 F.2d 916, 918 (8th Cir. 1969).

## I. *Ross' Supervisory Status*

Section 2(11), 29 U.S.C. § 152(11), defines a "supervisor" as

any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

■ The definition lists the powers in the disjunctive. Therefore an individual's authority to exercise of any one of the powers justifies a finding of supervisory status. *NLRB v. Broyhill Co.*, 514 F.2d 655, 658 (8th Cir. 1975). The determination of who is a supervisor is a fact question which calls upon the Board's special function of applying the general provisions of the Act to the infinite gradations of authority with-

in a particular industry. *Id.* at 658. *See NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963). Therefore the Board may exercise a large measure of informed discretion and a court must accept its determinations so long as they have " 'warrant in the record' and a reasonable basis in law." *NLRB v. Broyhill Co.*, 514 F.2d at 658, *quoting Jas. H. Matthews & Co. v. NLRB*, 354 F.2d 432, 435 (8th Cir.), *cert. denied*, 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966).

■ The Board based its determination that Wade Ross possessed supervisory status upon findings that he possessed and exercised authority with respect to job assignments, transferring employees from one department to another, directing work, correcting time clock cards, and effectively recommending discharges and wage increases. The record contains conflicting evidence, but on the whole it supports the findings and conclusions of the Board. We reject all the Company's challenges to the Board's attribution of supervisory status to Ross. We comment on two.

■ Ross testified that Nevada Street Plant Manager Philip Sorrell, in the afternoon before going home, would advise him about the workload for the evening, whether there was any necessity for moving employees from one department to another, what he wanted, or what production he expected from the department that night. The Company argues that Sorrell's advice to Ross precluded the Board from drawing any inference that Ross was a supervisor from the numerous occasions on which Ross had transferred employees from one department and assigned them to jobs in another. Contrary to the Company's contention Ross did not state that the transfers and assignments he made were made pursuant to Sorrell's instructions. The Board's inference of Ross' independent judgment in this area may stand.

Evidence showed Ross' participation in the discharge of two employees. In one instance Ross apprised Sorrell that Richard Gross had left the plant at lunch time the

previous day without clocking out or without advising either Ross or his immediate leadman that he was leaving and that Gross had done so on other occasions. Sorrell informed Ross to terminate Gross. Ross testified "But I didn't terminate him myself. Mr. Sorrell terminated him the very same evening.... I was with Mr. Sorrell when we terminated him." (Tr. 79.)

In the other discharge, Ross reported to Sorrell that Carl Langston would use profanity in front of women and would sneak around when no one was looking, go into the lunchroom, get other employees' lunches, and eat them, and that Ross personally had caught Langston eating other employees' lunches. Sorrell advised Ross to terminate Langston if he caught him stealing lunches again. A few days later, Ross again caught Langston eating someone else's lunch and immediately terminated him telling him among other things that Ross had repeatedly had to talk to him about his conduct toward women. Sorrell was not present when Ross terminated Langston nor did Ross contact Sorrell when Ross decided to terminate Langston. Ross, however, did testify that on one prior occasion when he caught Langston, he told him that if he had the authority he would terminate him, but that he would have to discuss it with Sorrell. (Tr. 81.) We do not accept the Company's view that the evidence related to the discharges precludes an inference that Ross went beyond merely reporting facts, and made effective recommendations to Sorrell.

## II. *Section 8(a)(1) Violations*

Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with an employee's exercise of these rights. "The test of a violation of § 8(a)(1) is whether the employer's conduct

'reasonably tends to interfere' with the employees' exercise of their Section 7 rights." *NLRB v. Hitchiner Manufacturing Co.,* 634 F.2d 1110, 1113 (8th Cir. 1980).

### A. *Ross' Statements*

Ross told Kenneth Jones, "Well, you know what happened to you last time, the last time you were involved in a union activity." Ross recalled asking Stewart and Jones what they were going to do with all the time off that they were going to have on their hands. Jones testified that the last time there had been Union activity Jones and fourteen other employees had been laid off and Jones was reinstated pursuant to a settlement of unfair labor practices charges. (Tr. 151–153.) Ross stated that he made the comment to Jones and Stewart as a result of discussing with them what would happen if a union was voted in and the possibility of a strike or something like that happening. Jones and Stewart acknowledged that the statement about the time off was made in a joking manner. Stewart testified that he and Jones laughed when Ross made the statement. But Jones testified that the employees "used the joking facade to probe Wade [Ross] for ... his intentions and the Company's intentions."

The Company characterizes these statements of Ross as isolated, sporadic, and made in a friendly, joking setting. The Company then invokes *General Thermo, Inc. v. NLRB,* 664 F.2d 195 (8th Cir. 1981), to argue that the statements cannot constitute violations. In contrast to the questioning in *General Thermo,* Ross' comments specifically reminded employees of the layoff which accompanied the prior Union activity and occurred in the work place, not in the recreational atmosphere of a picnic. *See NLRB v. Speed Queen,* 469 F.2d 189, 192 (8th Cir. 1972). These statements of Ross when viewed in the context of the frequency and content of other statements made by President Reagan, Plant Manager Sorrell, and by himself lead us to conclude that the General Counsel sustained the burden of proving interference outlined in *NLRB v. Link-Belt Co.,* 311 U.S. 584, 599, 61 S.Ct.

358, 365, 85 L.Ed. 368 (1941), and *NLRB v. General Industries Electronics Co.,* 401 F.2d 297, 300 (8th Cir. 1968), namely, whether the statements in their setting are reasonably likely to restrain, and whether the employer may fairly be held responsible for them. *McGraw-Edison Co. v. NLRB,* 419 F.2d 67, 71 (8th Cir. 1969).

### B. Creating the Impression of Surveillance

■ Creating an impression that a company keeps its employees' union activities under surveillance violates Section 8(a)(1) because it could inhibit the employees' right to pursue union activities untrammeled by fear of possible employer retaliation. *NLRB v. Ralph Printing and Lithographing Co.,* 379 F.2d 687, 691 (8th Cir. 1967).

The Board credited testimony by Jones and Stewart that, on April 9, in a speech to employees, Sorrell said "the last time there had been a union election, Mr. Reagan found out everyone who had signed cards in favor of the Union," and that Ross made a similar statement. Sorrell testified that he gave a very brief speech to employees on that day. Sorrell admitted that he said that Reagan and Company Attorney Robert McDonald had seen some of the cards. According to Sorrell, that statement responded to questions from employees who had asked him specifically whether McDonald and Reagan had seen some cards in the previous Union election. The Board found the testimony of Jones, Stewart, and Sorrell essentially the same, but, relying on the ALJ's impression, found Jones and Stewart more trustworthy and truthful and thus accepted their version of the events as more accurate.

■ The Company cites *NLRB v. Colony Printing and Labeling, Inc.,* 651 F.2d 502 (7th Cir. 1981), for the proposition that a company may fairly respond to issues raised by a union. The Board, however, did not credit Sorrell's testimony that he made his statement in response to employees' questions. Substantial evidence in the record as a whole supports the Board's finding that employees could reasonably assume from the statements of Sorrell and Ross that the company had their union activities under surveillance.

### C. Interfering With Union Insignia

■ Absent special circumstances which justify a prohibition on wearing union insignia, an employer violates Section 8(a)(1) if it interferes with the wearing of union insignia by its employees during a union organizational campaign. *Republic Aviation Corp. v. NLRB,* 324 U.S. at 801–804, 65 S.Ct. at 987–988; *Fabri-Tek, Inc. v. NLRB,* 352 F.2d 577, 584–85 (8th Cir. 1965). The Company does not argue that any special circumstances apply to this case.

The Board found that, on April 10, Ross asked Stewart, who was wearing a sweatshirt with "AFL–CIO" on it, if it was smart wearing the shirt. Stewart replied that he did not know if it was smart, but that he felt it was right. Ross then told Stewart, "Don't you think the smart thing to do would be to take—to pull the mother f_ _ _ _ _ inside out?" According to Stewart, Ross came back to the mill, and approached Stewart and made the comments concerning the sweatshirt in the presence of Jones and an employee named Johnson. Ross denied making the statements. Upon cross-examination, Stewart said that he had given four written pretrial statements concerning the facts and circumstances surrounding his employment with the Company, none of which mentioned the sweatshirt incident. Furthermore, in the first affidavit Stewart gave to the Board, he specifically stated, "None of the three (Reagan, Ross, and Sorrell) said anything about the [Union] button or shirt." Jones made no mention of the sweatshirt in his testimony. Johnson did not testify. Stewart testified that the noise in the mill prevented someone standing five feet away from hearing a conversation. (Tr. 292.)

■ The Company contends that the evidence fails to support the Board's conclusion that Ross made the statement concerning the sweatshirt. The Board credited Stewart's testimony regarding the sweat-

shirt incident, notwithstanding the failure of the prior affidavits to mention the incident and one prior contradictory statement, because Stewart impressed the ALJ as a reliable and truthful witness. Ross' denial was specifically discredited by both the ALJ and the Board. We think the specifically credited testimony fulfills the requirement of substantial evidence, notwithstanding the other evidence which tended to impeach.

### III. *Discriminatory Discipline*

An employer violates Section 8(a)(3) by disciplining an employee because of the employee's union activity. In discipline cases the Board must decide, not whether the employee merited the discipline, but whether the employee's protected activities motivated the employer to discipline the employee. *Sioux Quality Packers v. NLRB*, 581 F.2d 153, 156–57 (8th Cir. 1978). Intent is subjective and in many cases can be proven only by circumstantial evidence. In analyzing the evidence the Board may draw any reasonable inference. *NLRB v. Melrose Processing Co.*, 351 F.2d 693, 698 (8th Cir. 1965).

We must accept the Board's assessment of an employer's motivation if substantial evidence supports the assessment. Thus, we may not displace the Board's choice between two fairly conflicting views, even though we would have made a different justifiable choice if we had considered the matter *de novo*. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Kansas City Power & Light Co. v. NLRB*, 641 F.2d 553, 556 (8th Cir. 1981).

### A. *The Discharge of Stewart*

Stewart commenced work for the Company in December, 1979 and worked until April 24, 1980. For approximately his last two and one-half months, Stewart was an assistant mill operator under the guidance of Jones, the mill operator of the Company's large mill. Stewart described his duties as an assistant mill operator as follows: "I'd load and unload parts; I would go and get the next job ready; get the parts ready to bring over to the mill. I would help Mr. Jones figure etch rates for the mill."[1] Stewart testified he had never operated the mill without the assistance of Jones. Stewart had assisted Jones in working on parts requiring as many as eight cuts.[2]

On April 24, the night Stewart was discharged, he and others were told by President Reagan that if they wanted to work in a union shop, they should quit and get the hell out right then. On that night Jones quit in the middle of the shift. After Jones quit, Ross went back to the mill to determine what stage Jones' work had reached. Ross then took his dinner break, at the end of which he returned to the mill area and found Stewart, who had remained at his work station during the dinner break because Jones had quit, checking over the parts that Jones had been working on, apparently attempting to determine what remained to be done. Stewart testified that he miked the etchings on some eight-cut parts during the dinner break. Jones corroborated Stewart's testimony by recounting that Ross had told them to stop running four-cut parts and to load some eight-cut parts. (Tr. 221.) Stewart stated that Ross asked him if he was ready to take over the mill and run some parts, which Ross told him were worth $1,000 a piece. Stewart replied that he could not operate the mill. Ross responded, "John, I feel like you had enough experience to run them but if it was up to me, I wouldn't start a man on these

---

**1.** Stewart defined an "etch rate" as the number of mills per minute removed from an aircraft part while in a caustic solution.

**2.** The number of cuts refers to the times a part is processed through the chemical milling solution. The amount of metal to be removed from a particular area may differ from that to be removed from other areas of the same part. Thus, a taping process is used so that only a portion of the part will be cut during each dip into the solution. The more cuts per part, the greater chance of having the part out of tolerance at the end of all the cuts. Stewart acknowledged that the number of cuts on a part made no difference in running the part unless mistakes were made.

parts." According to Stewart, Ross then told him to hang loose while he went to call someone. (Tr. 263.)

After Ross discussed the matter with Supervisor Terry O'Bryan, they decided to close the small mill and take Kenneth Johnson from that mill to the large mill for the remainder of the night. Ross testified that approximately an hour later Sorrell called and Ross explained what had happened. Sorrell told Ross that he would be back in touch in a few minutes.

Stewart testified that Ross brought Johnson over to the large mill and told Stewart to unload the eight-cut parts and to load three-cut parts in place of them. (Tr. 264.) Thus, Ross' testimony that no eight-cut parts were run on April 24 does not clearly contradict the testimony of Stewart and Jones. After Stewart observed Johnson run the three-cut parts, Stewart asked if he could run them on his own under Johnson's supervision. According to Stewart, Johnson allowed him to do so.

Stewart then went to Ross' office and told him, "Mr. Ross, I can do the job back there. You can send Mr. Johnson back to the small mill if you'd like." According to Stewart, Ross replied, "That's fine. I thought you could do it. I'm expecting a call from Mr. Sorrell any minute." According to Stewart, Ross told him he did not know if Stewart would be put in charge of the large or small mill, that Ross really did not know what was happening, but that he would get back to him.

According to Ross, Sorrell later called back and told Ross that he had contacted the Company Attorney, McDonald, who advised Sorrell as to what he wanted done or how to handle it. (Tr. 109.) Ross related that Sorrell then

> advised me that due to the fact that Mr. Stewart had been a trainee, a parts loader, an assistant trainee, or ever how you'd want to call it, to Mr. Jones at the mill for a period, I'd say, roughly ninety days, forty-five days, sixty days, whatever it falls in out there, that he felt like Mr. Stewart, during this time should have, you know, learned enough about the mill-

ing facility that he should have been able to run the mill. He advised me that if Mr. Stewart couldn't run the mill, he couldn't make the cuts on the big part, then he felt that possibly we should go ahead and terminate Mr. Stewart. So this is what happened.

(Tr. 110.) Asked whether he had told Sorrell that Stewart had come and expressed willingness to try to run the mill, Ross replied, "I really don't know if I'm sure I did or not. I can't say I'm sure, I really can't say whether I did or I didn't, but I may have." (Tr. 111.) When confronted with a prior affidavit Ross admitted that he had told Sorrell of Stewart's willingness to try to run the mill but that Sorrell still told Ross to terminate Stewart. (Tr. 113.) Ross testified that he was sure that Stewart had sufficient experience working with Jones to be capable of operating the mill. The Company does not rely on Ross' explanation that Stewart was fired for failing to learn to run the mill within a reasonable time. The Company now asserts that Stewart "refused" to operate the mill when requested to do so by Mr. Ross. But the record is ambiguous. Stewart's cross-examination contains these exchanges:

> Q. [I]t's true isn't it that you flatly refused to pick up or take up the operation of the mill after Jones quit?
>
> A. Yes sir, when Mr. Ross came back there I said, "I cannot run these parts."
>
> . . . .
>
> Q. I want to make this very clear, at the time Mr. Ross said, "Okay John, are you ready?"
>
> A. Yes sir.
>
> Q. You said, "No."
>
> A. Yes sir, that's—
>
> Q. And you refused to run the parts, is that correct?
>
> A. Yes sir, that's correct. Yes sir.

(Tr. 305–306.) But on re-direct Stewart testified:

> Q. I believe you testified that you refused to run the parts on April 24, 1980. . . . [W]ere you ever specifically told to run any parts?

A. Mr. Ross did come back and ask me, "Are you ready to run those parts?"

Q. ... [M]y question was, were you ever specifically told to run them?

A. No. No. I wasn't.

(Tr. 310–11.) The record strongly suggests that Stewart reasonably questioned his competence to operate the mill, at first, but was willing to try after receiving guidance from Johnson. At any rate the record did not require the Board to find that Stewart insubordinately refused to operate the mill. The Board's finding of an unfair labor practice in the discharge of Stewart did not breach whatever law of the case the Board may have established by its decision that the Company did not commit an unfair labor practice by failing to recall Jones, who quit in the middle of the shift and thereby shut down part of the Company's operation. The Board reasonably could reach different conclusions concerning Stewart and Jones. *Cf. Crenlo, Division of GF Business Equipment, Inc. v. NLRB,* 529 F.2d 201, 205 (8th Cir. 1975).

■ Stewart was an open Union advocate, the only Nevada Street employee on the second shift to wear Union insignia. The Board found that the timing of Stewart's discharge, the Company's anti-Union comments, and the Company's knowledge of Stewart's willingness to do the milling job indicated the Company's unlawful motive. The Board had sufficient grounds to conclude that the Company's asserted reason for the discharge, Stewart's alleged refusal to perform work when called upon to do so, was a pretext. *R.J. Lallier Trucking v. NLRB,* 558 F.2d 1322, 1325–26 (8th Cir. 1977); *NLRB v. Melrose Processing Co.,* 351 F.2d at 698.[3]

### B. *The Disciplining of Stephens*

#### 1. *The Transfer*

■ The Board found that the Company transferred Stephens from the day to the night shift on April 3 because he engaged in protected activity. The Board's conclusion was based in part upon the fact that the Company did not replace Stephens after he was terminated on April 23. The Company argues that the failure to replace Stephens should not give rise to an inference that legitimate business reasons did not motivate his transfer. The Company's argument relies upon Reagan's testimony that Stephens was not replaced because Stephens had trained two people in his specialty since the transfer and the temporary backlog had begun to come under control. But Reagan conceded that the one individual who remained was only partially trained and that Stephens' training responsibilities resulted in the production of fewer parts than if Stephens had remained on the first shift. (Tr. 55.) Furthermore Reagan later contradicted himself about the state of the workload at the time of Stephens' discharge. (Tr. 565–66.) We see no basis for faulting the inferences drawn by the Board.

#### 2. *The Discharge*

■ We reject the Company's argument that the fact that Stephens had been involved in three incidents characterized by the Company as harassment of other employees precluded the Board from finding that the Company's reasons for discharging him were pretextual. The availability of a lawful cause for a discharge is no defense when the employee is actually discharged because of union activity. *NLRB v. Ace Comb Co.,* 342 F.2d 841, 847 (8th Cir. 1965). In discussing these incidents and Stephens'

**3.** The ALJ found that the Company did not demonstrate that it would have taken the same action even absent the protected conduct. *Wright Line, a Division of Wright Line, Inc.,* 251 N.L.R.B. 1083, 1089 (1980), *enf'd,* 662 F.2d 899 (1st Cir. 1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). See *NLRB v. Fixtures Manufacturing Corp.,* 669 F.2d 547, 550 n. 4 (8th Cir. 1982). The Company argues that the ALJ improperly allocated to

the Company the risk of non-persuasion. The Board, however, found that the Company's reason for the discharge was "plainly pretextual." It follows that the Board was satisfied that the General Counsel had proved that unlawful motivation caused the discharge. The same difference in approach between the Board and the ALJ marked their treatment of Stephens' discharge.

ill-advised confrontation with the Company Vice President, the ALJ used language to the effect that these matters did not "justify" or "warrant" discharge. He went on to find, however, that Stephens' protected activities were the motivating factor in the discharge. The Company correctly points out that it would not be within the province of the ALJ or Board to review the severity of discipline for proved misconduct. Board counsel's brief correctly frames the question as whether it is plausible that the incidents would have led the Company to discharge Stephens. We interpret the ALJ's findings in that light, but in any event the Board clearly addressed the proper issue in finding that assigning these incidents as cause was "plainly pretextual."

It bears emphasis that Stephens was a two year employee with a good record, prior to the organizing effort. He was the originator of that effort, having sought Union help in early March, having begun successful solicitation of signatures March 17 at the Central Street plant, having been confronted by the Company President March 21 when soliciting signatures at the Nevada Street plant, and having been very vocal in supporting the drive thereafter. In several instances he made his Union support known directly to Reagan after being transferred to the night shift.

The Company contends that it established that the only other incident where an employee used abusive language around women had resulted in a discharge. Reagan's testimony to that effect, however, was vague, without particulars, and Langston's discharge appears to have been based on conduct other than his use of profanity to women. (Tr. 82.)

■ We conclude that the Board reasonably found that the so-called harassment and insubordination incidents were pretextual.

## IV. *The Reinstatement Remedy*

■ Section 10(c) of the Act grants the Board broad authority, upon finding that an employer has engaged in an unfair labor practice, to order "such affirmative action including reinstatement of employees with or without backpay, as will effectuate the policies of [the] Act." 29 U.S.C. § 160(c). Courts generally defer to the Board's discretion in ordering reinstatement and backpay.

The Company contends that even if it illegally discharged Stephens, testimony that he admitted selling marijuana at the plant precludes reinstatement. Vice President Loren Furnas testified that in September 1979 the local police department told him that Stephens had been arrested for dealing in drugs. Stephens told Furnas that they were trying to trump up charges against him. The Company gave Stephens time off to go to court and later asked him several times if there was anything more to it. Stephens replied that nothing was happening. The Company took no disciplinary action based on these allegations, despite President Reagan's testimony that a Company rule made involvement with drugs cause for discharge. The Company does not contend that the drug charges contributed to its decision in April 1980 to discharge Stephens.

■ The Company, however, now contends that the Board's remedial action is barred by an allegation which reportedly first came to the Company's attention two weeks before the Board's December 9, 1980 hearing. The new allegation was made by a Company employee, Pam Trumble, one of the employees allegedly harassed by Stephens. According to Trumble, in June 1979, Stephens had remarked that he and his wife "had not had to cash any of their checks from Chem-Fab, because they were putting it in a bank and they were living off what they made off of sales there in the plant with the marijuana, and she was selling it over at plant two." (Tr. 486.) The General Counsel did not recall Stephens after the Company introduced evidence about the remark. The Board did not abuse its discretion when it concluded that the record proof did not warrant denying Stephens' reinstatement.

We also reject the Company's suggestion that the ALJ's crediting the other employees' versions of exchanges with Stephens when different from Stephens' version amounted to a finding that Stephens testified falsely.

Enforcement ordered.