# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 03-3627, 03-3863

_____

| | | |
|---|---|---|
| Wal-Mart Stores, Inc., | * | |
| | * | |
| Petitioner/Cross-Respondent, | * | |
| | * | |
| v. | * | |
| | * | |
| National Labor Relations Board, | * | Appeal from the National |
| | * | Labor Relations Board |
| Respondent/Cross-Petitioner, | * | |
| | * | |
| United Food and Commercial Workers | * | |
| Union, Local 1000, | * | |
| | * | |
| Intervenor on Appeal. | * | |

_____

Submitted: December 15, 2004
Filed: March 14, 2005

_____

Before MELLOY, BRIGHT, and BOWMAN, Circuit Judges.

_____

MELLOY, Circuit Judge.

Petitioner appeals the National Labor Relations Board's order finding that it violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3) (the "Act"), by punishing employee Brian Shieldnight for union

solicitation. The Board cross-appeals and asks that we enforce the order. We affirm in part and reverse in part the finding of Section 8(a)(1) and 8(a)(3) violations and enforce the Board's order as modified.

I.

This case arises from efforts to unionize employees at the Wal-Mart store in Tahlequah, Oklahoma. The store, like all Wal-Mart stores, maintains and enforces a policy that prohibits solicitation during employees' work time, regardless of the cause or organization. According to this policy, Wal-Mart prohibits its associates from engaging in solicitation on behalf of any cause or organization in public areas of the store at any time during which the store is open to the public.

Brian Shieldnight, an employee of the Tahlequah Wal-Mart, contacted the United Food and Commercial Workers Union, Local 1000 ("Union") about possible union representation. He obtained authorization cards from the Union to organize employees at the Tahlequah store.

On January 29, 2001, Shieldnight entered the store while off-duty. He wore a t-shirt that read "Union Teamsters" on the front and "Sign a card . . . Ask me how!" on the back. Assistant Store Manager John Lamont and Assistant Night Manager Tammy Flute saw Shieldnight's t-shirt and saw him speak to an associate. Flute told the associate to return to work, and Lamont ordered Shieldnight to leave associates alone. Lamont then consulted a Wal-Mart "union hotline." The hotline representative told Lamont that Shieldnight's shirt constituted solicitation and that Shieldnight should be removed from the store. Lamont and Flute sought out Shieldnight. They found him in the jewelry department talking to two friends who were not associates. Lamont informed Shieldnight that his shirt constituted a form of solicitation and that he would have to leave the store immediately. Lamont

-2-

escorted Shieldnight to the front door of the store and instructed him to leave the store and Wal-Mart property.

The next incident occurred on January 30, 2001. While on duty at the store, Shieldnight invited Department Manager Debra Starr and associates Patricia Scott and James Parsons, all of whom were also on duty, to a union meeting. Shieldnight asked Starr to come to the meeting and stated that he would like her to consider signing a union authorization card. Shieldnight separately asked Scott and Parsons to attend the meeting to hear "the other side of the story."

Based on these two incidents, Co-Manager Rick Hawkins and Assistant Manger John Lamont held a written "coaching session" with Shieldnight for violating the no-solicitation rule. A "coaching session" is part of Wal-Mart's progressive discipline process. Verbal coaching and written coaching are the first two steps in a four-step process. Hawkins and Lamont explained to Shieldnight that he had violated the solicitation policy on January 29 by soliciting on the sales floor with his t-shirt and on January 30 by verbally soliciting employees while on-duty and on the sales floor. Lamont told Shieldnight that it was wrong to have sent Shieldnight off Wal-Mart property completely. Lamont clarified that while Shieldnight could not solicit on the sales floor, he could do so in the parking lot while not on duty. Hawkins, Lamont, and Shieldnight also discussed Shieldnight's questions and concerns regarding Wal-Mart employment policies, such as health insurance for associates. Lamont suggested Shieldnight should raise the matter in "grassroots" meetings that all Wal-Mart stores hold to identify the top three company-wide issues. The three men arranged a time to meet in the future. That meeting never occurred.

The Union subsequently filed an unfair labor practice charge against Wal-Mart on February 2, 2001, and an amended charge on April 27, 2001. The Union claimed Wal-Mart violated Section 8(a)(1) by denying Shieldnight access to its facility and Section 8(a)(3) by disciplining him for his solicitation efforts. The Regional Director

for the National Labor Relations Board for Region 17 issued a complaint on May 18, 2001. An administrative law judge ("ALJ") ruled that Shieldnight violated Wal-Mart's solicitation policy when he verbally solicited three employees, but did not engage in solicitation or violate Wal-Mart's policy when he wore the "Sign a card . . . Ask me how!" t-shirt. The ALJ concluded that Wal-Mart violated Section 8(a)(1) by removing Shieldnight from the store for wearing the t-shirt and Sections 8(a)(1) and 8(a)(3) for disciplining him, in part, on the t-shirt incident.

Wal-Mart filed exceptions to the ALJ's findings regarding the t-shirt solicitation. The Union and the Board filed cross-exceptions regarding the verbal solicitation. On September 30, 2003, a divided Board panel found that Shieldnight had not engaged in solicitation when he: 1) wore the t-shirt during his shift; 2) asked on-duty employees to attend a union meeting; or 3) asked a co-worker to sign a union card. The panel concluded that Wal-Mart violated the Act by asking Shieldnight to leave the store, and by coaching him regarding both incidents. Wal-Mart appeals that decision.

II.

The issues in this case are whether the following three incidents constitute solicitation: 1) when Shieldnight wore a t-shirt which read "Sign a card . . . Ask me how;" 2) when he had conversations with co-workers about attending a union meeting; or 3) when he asked a co-worker to sign a union authorization card. The Board held that none of these actions constituted solicitation.

"Our standard of review affords great deference to the Board's affirmation of the ALJ's findings." Town & Country Elec., Inc. v. NLRB, 106 F.3d 816, 819 (8th Cir. 1997). "We will enforce the Board's order if the Board has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole." Id. Substantial evidence exists when "a 'reasonable mind might accept' a

particular evidentiary record as 'adequate to support a conclusion.'" <u>Dickinson v. Zurko</u>, 527 U.S. 150, 162 (1999) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).

A.    The T-shirt

The Union contends that Shieldnight's t-shirt did not constitute solicitation, but rather was a "union insignia."  Wal-Mart argues that by encouraging people to approach him, Shieldnight's t-shirt was a form of solicitation.  In <u>NLRB v. W.W. Grainger, Inc.</u>, 229 NLRB 161, 166 (1977), the Board held:

> "Solicitation" for a union usually means asking someone to join the union by signing his name to an authorization card in the same way that solicitation for a charity would mean asking an employee to contribute to a charitable organization . . . or in the commercial context asking an employee to buy a product or exhibiting the product for him . . . .

Ordinarily, employees may to wear union insignia while on their employer's premises.  <u>NLRB v. Chem Fab Corp.</u>, 691 F.2d 1252, 1258 (8th Cir. 1982) ("Absent special circumstances which justify a prohibition on wearing union insignia, an employer violates Section 8(a)(1) if it interferes with the wearing of union insignia by its employees during an organizational campaign.").  This protection includes the right to wear union insignia on shirts.  <u>Id</u>.  An employer may not bar the wearing of union insignia, such as on t-shirts, merely because it contains words such as "join," "vote," or "support."  <u>NLRB v. The Devilbiss Co.</u>, 102 NLRB 1317, 1321 (1953) ("the words 'join' or 'vote' or 'support' do not destroy the essentially protected character of the insignia and convert such insignia into the kind of solicitation which is otherwise amenable to proper rules").  Union propaganda must involve more than merely this type of language to convert permissible union insignia into impermissible solicitation.

The Board stated that the t-shirt should be treated as union insignia because "[i]t did not 'speak' directly to any specific individual . . . and it did not call for an immediate response, as would an oral person-to-person invitation to accept or sign an authorization card." NLRB v. Wal-Mart Stores, Inc., 340 NLRB No. 76, 2003 WL 22273588 at *4 (2003). The Board found that there was "no claim or evidence that Shieldnight did anything in furtherance of the T-shirt message . . . . He merely walked around and socialized . . . about nonunion matters." Id. Anyone, including any Wal-Mart employee who saw Shieldnight on January 29, was free to ignore both Shieldnight and the message on the t-shirt. In contrast, a solicitation to sign an authorization card requires more interaction, likely a direct yes or no answer. Absent further evidence of direct inquiry by Shieldnight, the Board's conclusion was supported by substantial evidence.

Wal-Mart alleges that the panel's conclusion is not reasonable because it ignores both Shieldnight's purpose and the long-held rule that an employer may implement rules against solicitation during work time to prevent interference with work productivity. Fabri-Tek, Inc. v. NLRB, 352 F.2d 577, 585 (8th Cir. 1965) ("[A]n employer can prohibit or regulate the wearing of union insignia where, as the Trial Examiner himself states, there are 'special considerations relating to employee efficiency and plant discipline.'" The right to restrict organizational activity, such as the wearing of union insignia

> is limited to the restriction of activities which disrupt, or tend to disrupt, production and to break down employee discipline, and does not include restriction of passive inoffensive advertisement of organizational aims and interests, i.e., the wearing of advertising insignia and buttons, which in no way interferes with discipline or efficient production.

Fabri-Tek, 352 F.2d at 585.

The employees in Fabri-Tek lost the right to wear oversized buttons and "ordinary insignia in an extraordinary way," because it disrupted from a complex production process in which "concentration was a necessity." Id. at 586 (stating that employees "never lost their right to wear union insignia in the form of customary buttons"). Fabri-Tek manufactured magnetic memory devices for computers and other digital equipment. Id. at 579. This Court stated that "there is no doubt that [Fabri-Tek's] finished product is extraordinarily complex . . . . It is also undisputed that each step in the fabrication . . . is done by hand and requires a high degree of concentration." Id. (noting also the rigorous requirements regarding the quality of each finished product). Fabri-Tek had taken great efforts to minimize distractions in the workplace. Id. at 580. The special circumstances, in particular the "the importance of eliminating distractions . . . which could lead to a substantial increase in poorly produced [items]," Id. at 583, justified the prohibition on "wearing of unusual union insignia or usual union insignia in an unusual way." Id. at 583, 586. Fabri-Tek is distinguishable from the present case because the unique disruption that justified the imposition of restrictions in Fabri-Tek are not present here.

Fabri-Tek holds that an employer may prohibit the wearing of union insignia that would otherwise be protected if there are special circumstances and the restrictions are narrowly tailored to address the special circumstances. "[T]he burden of establishing [special] circumstances rest[s] on the employer," who must show by substantial evidence that those circumstances exist. Am. Fed'n of Gov't Employees, 278 NLRB 378, 385 (1986). Wal-Mart did not put forth any evidence of special circumstances akin to those present in Fabri-Tek that would justify the prohibition of Shieldnight's t-shirt. Although Shieldnight's shirt may have been more visible than the buttons in Fabri-Tek, Wal-Mart failed to demonstrate how the t-shirt interfered in any manner with the operation of the store. Accordingly, substantial evidence supports the Board's conclusion that Shieldnight's t-shirt did not constitute solicitation.

## B. The Co-Worker Conversations

As stated earlier, an employer may implement rules against solicitation during work hours to prevent interference with work productivity. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803 n.10 (1945). "[S]olicitation for a union is not the same thing as talking about a union or a union meeting or whether a union is good or bad." W.W. Grainger, Inc., 229 NLRB at166. The employer may not, therefore, prevent conversations about unions that do not interfere with work productivity. Although not binding on this court, the Board has consistently concluded that an employee does not engage in solicitation when he makes pro-union statements during working hours such as "support the union," "there is a meeting tonight," or "the meeting is cancelled." Id. at 161 n.2 and 166; see also NLRB v. Yamaha Music Mfg., Inc., 301 NLRB 1097, 1101 (1991) (invitation from on-duty employee to ten co-workers to attend union meeting was not a violation of employer's no solicitation rule); NLRB v. Sahara-Tahoe Corp., 216 NLRB 1039, 1042 (1975) (holding that introducing a co-worker to a union representative did not constitute solicitation); NLRB Flamingo Hilton-Laughlin, 324 NLRB 72, 110 (1997) (concluding that a conversation during work hours in which an employee asked another employee questions about union issues was not solicitation).

In this case, Shieldnight invited three co-workers to a union meeting. These facts are analogous to those in Yamaha or Sahara-Tahoe. Shieldnight's statements did not require an immediate response from the three co-workers. Instead of a solicitation that required a response, the record shows that Shieldnight's statements were more akin to a statement of fact that put his co-workers on notice that there was to be a union meeting that night and that they were welcome to attend. Nothing in the record suggests that the environment at Wal-Mart made Shieldnight's actions uniquely disruptive. Accordingly, the panel's conclusion regarding Shieldnight's conversations was supported by substantial evidence. Furthermore, the panel acted reasonably when it concluded that "simply informing another employee of an

upcoming meeting or asking a brief, union-related question does not occupy enough time to be treated as a work interruption in most settings." <u>Wal-Mart Stores, Inc.</u>, 340 NLRB at *4.

### C. Asking Co-Worker to Sign a Card

The Board concluded that it was not solicitation when Shieldnight asked a co-worker to sign a union authorization card. This conclusion is not supported by substantial evidence. <u>Dickinson</u>, 527 U.S. at 162. Solicitation, as described earlier, includes asking someone to join a union by signing an authorization card. <u>W.W. Grainger</u>, 229 NLRB at 166. In this case, the record indicates that Shieldnight said he would "like for Starr to have a [union authorization] card to sign." Starr understood the exchange as a request to sign the card, an understanding likely to be reached by the average person in a similar situation.

In light of the totality of the circumstances, Shieldnight's actions constituted solicitation even though he did not actually offer Starr a card at the time he asked her to sign. <u>Fabri-Tek</u>, 352 F.2d at 587. Shieldnight had contacted the Union about obtaining union representation and had obtained cards from the Union for the purpose of organizing employees at the Talequah store. There is little doubt as to Shieldnight's intent in the words he spoke to Starr. The record indicates that Shieldnight did not have a card in his hand at the time he spoke to Starr. It is silent as to whether he had a card on his person. The fact that he did not place a card directly in front of Starr at the time of his statement makes little difference in regard to the nature of his conversation. Further, Shieldnight's actions in this instance are more analogous to a direct solicitation than when he asked his co-workers to attend the union meeting. Asking someone to sign a union card offers that individual person the choice to be represented by a union. Informing co-workers about a union meeting merely puts fellow employees on notice that a meeting is going to take place.

Accordingly, there is insufficient evidence to support the Board's conclusion that Shieldnight's actions were not solicitation, and thus we reverse the Board regarding the authorization card issue.

## III.

The Board cross appeals asking that we enforce the Board's remedial order. The Board ordered Wal-Mart to remove from Mr. Shieldnight's personnel file any reference to disciplinary action against him for the allegedly illegal solicitation. The Board also ordered Wal-Mart to post certain prescribed notices concerning employee union rights. The ALJ had recommended this sanction but limited the expungement of the personnel file to those items the ALJ determined to be protected activity and thus a violation of Sections 8(a)(1) and(3). The Board essentially adopted that recommendation with the expansion of the expungement to include all the activities the Board found to be protected. We enforce the Board order with the exception that Wal-Mart is not required to delete from Mr. Shieldnight's personnel file reference to the coaching session that resulted from solicitation of Debra Starr to sign a union authorization card.

BRIGHT, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority's decision in sections 2(A) and 2(B) of its opinion that the Board's order must be enforced as it pertains to the t-shirt incident and to Shieldnight's remarks about a union meeting.

I do not agree with the majority's reversal of the Board's order, in section 2(C) of the majority opinion, as to Shieldnight's remarks about a union card.

The majority errs in requiring the Board to interpret the concept of "solicitation" as the majority interprets and applies the concept. In reaching this decision the majority has, I believe, erred in three ways: (1.) It has misconstrued an issue of law as an issue of fact; (2.) it has misapprehended the role of the concept of "solicitation" in labor law; and (3.) it has not granted that deference to the Board which the Supreme Court has held we must grant. I discuss these points briefly in turn, after first stating what the Board decided in this case.

The Board's decision concerning "solicitation" in this case has two aspects: First, a legal conclusion that Sections 8(a)(1) and 8(a)(3) of the Act protect an employee's union-related activity in the workplace so long as the activity does not have significant potential to disrupt the workplace. Second, the Board's empirical judgment that talk about union cards which does not require some immediate active response by the listener does not, as a general matter, have significant potential for disruption – and thus cannot be barred as "solicitation" under a lawful "non-solicitation" policy. See In re Wal-Mart, 2003 WL 22273588, *3 (N.L.R.B.) (op. below).

**1.**

We do not review here the Board's findings as to the facts of this case, which would be reviewed under the substantial evidence standard that the majority states. Wal-Mart has repeatedly emphasized, in briefs and at oral argument, that it disputes not the facts, but only the Board's definition of "solicitation."[1] See Appellant's Br.,

---

[1]At oral argument, Wal-Mart's first substantive statement was, "The critical facts in this case are really not in dispute." After stressing the absence of such dispute for two minutes, counsel concluded: "What all that boils down to is that the only issue is: Was this – were these – acts solicitation or not?"

passim; Reply Br., passim. Indeed, the majority does not overturn any finding of fact. Rather, the majority decides that the undisputed facts constitute solicitation. In other words, the majority decides that the facts meet the majority's definition of "solicitation," reversing the Board's narrower definition of "solicitation" described above. See slip op., supra, at 9-10.

In reversing the definition that the Board stated, the majority reviews the Board's conclusion of law that the Act protects non-disruptive activity and the Board's policy judgment as to the general empirical question about what sorts of activities have significant potential to disrupt the workplace. Neither question requires reviewing the Board's findings of fact for substantial evidence.

**2.**

The majority has reviewed the Board's definition of "solicitation" as if that word appears in the Act – as if we are reviewing the Board's construction of statutory language – or as if the Board were interpreting a contract to determine the intent of the parties. The word "solicitation" does not appear in the Act. And the Board did not interpret Wal-Mart's non-solicitation policy as if it were a contract.

"Solicitation" is a term of art the Board has developed through decades of its case law, to determine what conduct companies may lawfully proscribe through "non-solicitation" policies. See, e.g., Overnite Transp. Co., Inc., 332 NLRB 1331 (2000); St. Luke's Hosp., 300 NLRB 836, 837 (1990); Ralph Nenner, M.D., et al, 253 NLRB 644, 648 (1980); Farah Mfg. Co., 187 NLRB 601, 601-02 (1970); Cook Paint & Varnish Co., 129 NLRB 427, 435 (1960); May Dep't Stores Co., 59 NLRB 976, 981 (1944) ["Solicitation Cases"].

In this case, Wal-Mart had a "non-solicitation" policy that read simply, "Associates may not engage in solicitation . . . during working time." J.A. at 527. Like any policy, this non-solicitation policy is enforceable to the extent it is lawful under the Act, and unenforceable to the extent it violates the Act. See Solicitation Cases.

The Board decides what activities are protected by the Act, thus deciding what can and cannot count as "solicitation" – and be forbidden – under policies such as Wal-Mart's. That is, the Board defines "solicitation" so as to render non-solicitation policies lawful under the Act, as implemented by the Board.[2] See Id.

The Board does not interpret the policy as if it were a contract, to determine the intent of the parties, and then decide whether the contract is lawful under the Act or not. In its case law, the Board simply decides what activities are protected by the Act, and treats those activities as non-solicitation – because companies cannot forbid them as "solicitation." See Id.

When the Board defines "solicitation," therefore, it is neither construing a term of the Act, nor is it interpreting a company's non-solicitation policy. It is deciding what activities are protected by the Act. It is defining a term of art, which incorporates the Board's construction of the Act and the Board's policy judgments as to general empirical matters concerning industrial life. See Id.

---

[2]The Board could approach its task differently. It could decide what the company means by "solicitation," and then decide whether the policy is lawful and to what extent the company can enforce it. The result of this more roundabout approach would be the same. But the Board has not generally taken this approach.

When we review the Board's definition of this non-statutory term of art, we are not reviewing a construction of a specific statutory term or a construction of a contract. We are reviewing the Board's construction of the Act as a whole and the Board's policy judgments as to matters within the area of its special competence.

**3.**

The Supreme Court has long held that we must defer to the Board's construction of the Act, so long as it is reasonably defensible.[3] See NLRB v. Town & Country Elec., Inc., 516 U.S. 85, 89-90 (1995); Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc., 467 U.S. 837, 842-44 (1984); NLRB v. Local Union No. 103, 434 U.S. 335, 351 (1978). The Supreme Court has also held that we must defer to the Board's reasonable policy judgments concerning general empirical matters of industrial life. See NLRB v. Erie Resistor Corp., 373 U.S. 221, 236 (1963).

The majority does not consider whether the Board's legal conclusion that the Act protects non-disruptive activity is reasonable. Nor does it consider whether the Board's policy judgment as to the general question about what sorts of activities have significant potential to disrupt the workplace is reasonable. Rather, by overturning the Board's definition of the non-statutory term of art "solicitation," the majority –

---

[3]On this point, Wal-Mart's counsel erred in asserting that "The Board's conclusions of law are reviewed de novo." Appellant's Br. at 14; Reply Br. at 2. Counsel cited a holding from a Sixth Circuit case – a holding that the Sixth Circuit repudiated only six months later, as contrary to binding Supreme Court precedent. Compare Evergreen Healthcare, Inc. v. NLRB, 104 F.3d 867, 873 (6th Cir. 1997) (cited in Appellant's Br. at 14 and in Reply Br. at 2) with NLRB v. Wencor Packaging, Inc., 118 F.3d 1115, 1119 (6th Cir. 1997).

granting no deference to the Board – reverses the Board's construction of the Act and its empirical judgment concerning the actualities of industrial life.

On the record before us, the Board's determinations are reasonable. Challenging their reasonableness, Wal-Mart asserts that if we allow the Board's judgment to stand, then we will soon have fistfights on the sales floor, Appellant's Br. at 22, and union activists in sandwich boards strolling through the kitchenware aisles of Wal-Mart stores, id. at 36. These exaggerated assertions do not overcome the Board's reasonable judgment on the issues raised on appeal.

I would enforce the order in its entirety.

_____